**Michael H. PRICE and Roger K. Frey, Appellees,**

v.

**SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, Appellant.**

**No. 00-7244.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 8, 2002.

Decided June 28, 2002.

Arman Dabiri argued the cause and filed the briefs for appellant.

James Cooper-Hill argued the cause for appellees. With him on the brief were Andrew C. Hall and Nelson M. Jones III.

Michael L. Martinez argued the cause for amicus curiae Blake Kilburn on his behalf and as administrator of the estate of Peter Kilburn. With him on the brief was Stuart H. Newberger.

Before: EDWARDS and SENTELLE, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case involves a lawsuit brought under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611 (1999), by two American citizens who sued the Socialist People's Libyan Arab Jamahiriya ("Libya") for torture and hostage taking. Plaintiffs' lawsuit seeks cover under a recent amendment to the FSIA which strips certain foreign states – including Libya – of their sovereign immunity in American courts when they engage in such conduct. *See* 28 U.S.C. § 1605(a)(7).

In response to plaintiffs' suit, Libya moved to dismiss, claiming sovereign immunity and a lack of personal jurisdiction. The District Court denied the motion to dismiss and Libya now seeks review in this interlocutory appeal. Two central questions have been raised on appeal: first, whether plaintiffs have alleged facts that are legally sufficient to revoke Libya's immunity under the FSIA; and, second, whether the assertion of personal jurisdiction over Libya in the manner specifically authorized by the FSIA violates the Due Process Clause.

We hold, first, that plaintiffs have failed to state a claim for hostage taking adequate to abrogate sovereign immunity and establish subject matter jurisdiction. The allegations set forth in the complaint do not come close to satisfying the definition of "hostage taking" prescribed by the FSIA. We hold further that the allegations supporting plaintiffs' torture claim are not adequate to bring the case within the statutory exceptions to foreign sovereign immunity. The complaint in its present form is simply too conclusory to satisfy § 1605(a)(7). In contrast to the hostage-taking claim, however, plaintiffs have at least intimated that they can allege facts that might state a proper claim for torture under the FSIA. Accordingly, we will remand the case to allow plaintiffs to attempt to amend their complaint in an effort to satisfy the statute's rigorous definition of torture. As a word of caution, we note that there is a question as to whether the complaint states a claim for relief upon which plaintiffs can recover; although this matter is not properly before us on interlocutory review, we are not foreclosing review of the issue in the District Court.

Finally, we hold that Libya, as a foreign state, is not a "person" within the meaning

of the Due Process Clause. We therefore conclude that the Constitution imposes no limitation on the exercise of personal jurisdiction by the federal courts over Libya.

## I. BACKGROUND

The facts and procedural history of this case are relatively straightforward. Plaintiffs Michael Price and Roger Frey, Americans who had been living in Libya in the employ of a Libyan company, were arrested in March of 1980 after taking pictures of various places in and around Tripoli. Libyan government officials apparently believed that these photographs constituted anti-revolutionary propaganda, because they would portray unfavorable images of life in Libya.

Price and Frey allege that, following their arrest, they were denied bail and kept in a "political prison" for 105 days pending the outcome of their trial. In their complaint, plaintiffs assert that they endured deplorable conditions while incarcerated, including urine-soaked mattresses, a cramped cell with substandard plumbing that they were forced to share with seven other inmates, a lack of medical care, and inadequate food. The complaint also asserts that the plaintiffs were "kicked, clubbed and beaten" by prison guards, and "interrogated and subjected to physical, mental and verbal abuse." Compl. at ¶ 4. The complaint contends that this incarceration was "for the purpose of demonstrating Defendant's support of the government of Iran which held hostages in the U.S. Embassy in Tehran, Iran." Id. at ¶ 7.

Ultimately, plaintiffs were tried and acquitted of the crimes with which they had been charged. After the verdict was announced, however, the Libyan government retained their passports for another 60 days while the prosecution pursued an appeal, which is permitted under the Libyan Code of Criminal Procedure. When this appeal was eventually rejected, plaintiffs were permitted to leave Libya.

On May 7, 1997, Price and Frey commenced a civil action against Libya in federal court. Their complaint asserted claims for hostage taking and torture and sought $20 million in damages for each man. Following receipt of process, Libya filed a motion to dismiss, arguing that (1) the grant of subject matter jurisdiction over plaintiffs' action was unconstitutional, (2) the court's exercise of personal jurisdiction was unconstitutional, and (3) plaintiffs had failed to state a claim on which relief could be granted. The District Court rejected each of these arguments, thus vitiating Libya's sovereign immunity defense and allowing the court to assert both subject matter jurisdiction over plaintiffs' claims and personal jurisdiction over the defendant. Libya now pursues an interlocutory appeal.

## II. DISCUSSION

On appeal, Libya has not renewed its constitutional attack on the court's subject matter jurisdiction. Instead, it claims that the District Court erred in not resolving certain disputed issues of fact, proceeding instead as if plaintiffs' factual allegations had already been established. Libya also argues that, even assuming that these facts were true, the plaintiffs have failed to make out a valid claim either for torture or hostage taking under the FSIA. Finally, Libya asserts that the Due Process Clause does not permit an American court to take jurisdiction over a foreign sovereign based on conduct that has no connection to the United States save for the nationality of the plaintiff.

### A. Plaintiffs' Cause of Action

Before we address the issues arising under the FSIA and the Due Process

Clause, we first want to make it clear that our decision today does not address or decide whether the plaintiffs have stated a *cause of action* against Libya. The parties appear to assume that a substantive claim against Libya arises under the FSIA, but this is far from clear. The FSIA is undoubtedly a jurisdictional statute which, in specified cases, eliminates foreign sovereign immunity and opens the door to subject matter jurisdiction in the federal courts. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 620, 103 S.Ct. 2591, 2596-97, 77 L.Ed.2d 46 (1983). There is a question, however, whether the FSIA creates a federal cause of action for torture and hostage taking *against foreign states. See Roeder v. Islamic Republic of Iran,* 195 F.Supp.2d 140, 171-73 (D.D.C.2002).

The "Flatow Amendment" to the FSIA confers a right of action for torture and hostage taking against an "official, employee, or agent of a foreign state," Pub. L. No. 104-208, Div. A, Title I, § 101(c) (Sept. 30, 1996), *codified at* 28 U.S.C. § 1605 (note); *see Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12-13 (D.D.C.1998), but the amendment does not list "foreign states" among the parties against whom such an action may be brought. While it is possible that such an action could be brought under the "international terrorism" statute, 18 U.S.C. § 2333(a), *cf. Boim v. Quranic Literacy Inst.,* 291 F.3d 1000 (7th Cir.2002), no such claim has been raised in this case.

The question relating to plaintiffs' cause of action has yet to be raised or addressed in the District Court, and it was neither briefed nor argued by the parties during this appeal. Therefore, although we flag the issue, we will leave its disposition to the District Court in the first instance following remand of this case. We will turn our attention now to the matters before us, *i.e.,* the issues arising under the FSIA and the Due Process Clause.

## B. The 1996 Amendments to the Foreign Sovereign Immunities Act

 The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443, 109 S.Ct. 683, 693, 102 L.Ed.2d 818 (1989). The statute, which was originally enacted in 1976, confers immunity on foreign states in all cases that do not fall into one of its specifically enumerated exceptions. *See* 28 U.S.C. §§ 1605, 1607; *McKesson HBOC, Inc. v. Islamic Republic of Iran,* 271 F.3d 1101, 1105 (D.C.Cir. 2001). These exceptions were crafted in order to codify the "restrictive theory" of sovereign immunity, under which immunity is generally limited to a foreign state's public or governmental acts (*jure imperii*) but withheld from its private or commercial acts (*jure gestionis*). *See* H.R. REP. No. 94-1487, at 7 (1976); *Jackson v. People's Republic of China,* 794 F.2d 1490, 1493 (11th Cir.1986).

The FSIA thus begins with a presumption of foreign sovereign immunity, 28 U.S.C. § 1604, qualified by a list of specific circumstances in which that immunity is unavailable. These include cases in which the state has waived its immunity, *id.* at § 1605(a)(1), cases based upon various forms of commercial activity, *id.* at § 1605(a)(2), takings of property in violation of international law, *id.* at § 1605(a)(3), and torts committed in the United States, *id.* at § 1605(a)(5). The original FSIA was not intended as human rights legislation. *See* Jennifer A. Gergen, *Human Rights and the Foreign Sovereign Immunities Act,* 36 VA. J. INT'L L. 765, 771 (1996). Thus, no matter how allegedly egregious a foreign state's conduct, suits that did not fit into one of the statute's

88

discrete and limited exceptions invariably were rejected. *See, e.g., Saudi Arabia v. Nelson*, 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (holding that a claim arising from the detention and torture of an American citizen in Saudi Arabia was not "based upon a commercial activity carried on in the United States"); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir.1996) (holding that Libya retained its sovereign immunity for the bombing of Pam Am 103 over Lockerbie, Scotland); *Princz v. Fed. Republic of Germany*, 26 F.3d 1166 (D.C.Cir. 1994) (holding that plaintiff could not recover for slave labor performed at Nazi concentration camps, because Germany's conduct was not commercial activity causing a "direct effect in the United States" and did not constitute an implied waiver of sovereign immunity); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir.1992) (holding that Argentina was immune from liability for acts of torture committed by the ruling junta); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 775 n. 1 (D.C.Cir.1984) (Edwards J., concurring) (FSIA precludes jurisdiction over Libya for armed attack on civilian bus in Israel); *cf. Amerada Hess*, 488 U.S. at 436, 109 S.Ct. at 689 ("[I]mmunity is granted in those cases involving violations of international law that do not come within one of the FSIA's exceptions.").

Under the original FSIA, therefore, terrorism, torture, and hostage taking committed abroad were immunized forms of state activity. *See* H.R. REP. No. 103-702, at 4 (1994) ("[T]he FSIA does not currently allow U.S. citizens to sue for gross human rights violations committed by a foreign sovereign on its own soil."). Indeed, in *Nelson*, the Supreme Court recognized that conduct of the sort alleged in the present case – "wrongful arrest, imprisonment, and torture" – amounted to abuses of police power, and "however mon-

strous such abuse undoubtedly may be, a foreign's state's exercise of the power of its police has long been understood for purpose of the restrictive theory as peculiarly sovereign in nature." 507 U.S. at 361, 113 S.Ct. at 1479; *see also* Mathias Reimann, *A Human Rights Exception to Sovereign Immunity: Some Thoughts on* Princz v. Federal Republic of Germany, 16 MICH. J. INT'L L. 403, 417-18 (1995) (observing that under the unamended FSIA "efforts to persuade the courts to recognize a human rights exception to sovereign immunity" had failed).

■ The mounting concern over decisions such as these eventually spurred the political branches into action. *See* John F. Murphy, *Civil Liability for the Commission of International Crimes as an Alternative to Criminal Prosecution*, 12 HARV. HUM. RTS. J. 1, 34 (1999). In 1996, as part of the comprehensive Antiterrorism and Effective Death Penalty Act("AEDPA"), Pub. L. No. 104-132, § 221(a), 110 Stat. 1214 (Apr. 24, 1996), Congress amended the FSIA to add a new class of claims for which certain foreign states would be precluded from asserting sovereign immunity. Specifically, the amendment vitiates immunity in cases

> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency[.]

28 U.S.C. § 1605(a)(7). In enacting this provision, Congress sought to create a judicial forum for compensating the victims

of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future. *See Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38, 50 (D.D.C.2000); Molora Vadnais, *The Terrorism Exception to the Foreign Sovereign Immunities Act,* 5 UCLA J. INT'L L. & FOREIGN AFF. 199, 216 (2000).

While such legislation had long been sought by victims' groups, it had been consistently resisted by the executive branch. *See* ALAN GERSON & JERRY ADLER, THE PRICE OF TERROR 212-26 (2001); H.R. REP. No. 102-900, at 3-4, 11 (1992). Executive branch officials feared that the proposed amendment to FSIA might cause other nations to respond in kind, thus potentially subjecting the American government to suits in foreign countries for actions taken in the United States. *See* Murphy, *supra,* at 35-37; H.R. REP. No. 103-702, at 12 (1994). Although these reservations did not prevent the amendment from passing, they nevertheless left their mark in the final version of the bill.

Section 1605(a)(7) has some notable features which reveal the delicate legislative compromise out of which it was born. First, not all foreign states may be sued. Instead, only a defendant that has been specifically designated by the State Department as a "state sponsor of terrorism" is subject to the loss of its sovereign immunity. § 1605(a)(7)(A). Second, even a foreign state listed as a sponsor of terrorism retains its immunity unless (a) it is afforded a reasonable opportunity to arbitrate any claim based on acts that occurred in that state, and (b) either the victim or the claimant was a U.S. national at the time that those acts took place. § 1605(a)(7)(B). In the present case, Libya has been designated as a sponsor of terrorism. *See* 31 C.F.R. § 596.201 (2001); *Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d 748, 764 (2d Cir. 1998). Moreover, both plaintiffs are American citizens, and Libya does not contend that it has been denied a chance to arbitrate their claims.

If service of process has been made under § 1608, personal jurisdiction over a foreign state exists for every claim over which the court has subject matter jurisdiction. *See* 28 U.S.C. § 1330(b). In turn, the statute automatically confers subject matter jurisdiction whenever the state loses its immunity pursuant to § 1605(a)(7). *See id.* at § 1330(a). Personal jurisdiction determinations always have been made in this way under the FSIA. *See* JOSEPH W. DELLAPENNA, SUING FOREIGN GOVERNMENTS AND THEIR CORPORATIONS 9 (1988) (commenting on this "significant compression," whereby both "competence [subject matter jurisdiction] and personal jurisdiction depend upon whether the foreign state is immune under the substantive rules in the act"); *see also Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056, 1065 (E.D.N.Y. 1979) (Weinstein, J.) (noting the way in which the FSIA collapses subject matter jurisdiction, *in personam* jurisdiction, and sovereign immunity into a single inquiry).

Under the original FSIA, however, it was generally understood that in order for immunity to be lost, there had to be some tangible connection between the conduct of the foreign defendant and the *territory* of the United States. *See Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 490 & n. 15, 103 S.Ct. 1962, 1969 & n. 15, 76 L.Ed.2d 81 (1983); Lee M. Caplan, *The Constitution and Jurisdiction over Foreign States: The 1996 Amendments to the Foreign Sovereign Immunities Act in Perspective,* 41 VA. J. INT'L L. 369, 406-08 (2001); *cf. McKeel v. Islamic Republic of Iran,* 722 F.2d 582, 588 (9th Cir.1983) ("[N]othing in the legislative history [of the 1976 Act] suggests that Congress in-

tended to assert jurisdiction over foreign states for events occurring wholly within their own territory. Such an intent would not be consistent with the prevailing practice in international law."). In this way, the original statute's immunity exceptions "prescribe[d] the necessary contacts which must exist before our courts can exercise personal jurisdiction." H.R. REP. No. 94-1487, at 13 (describing the Act's personal jurisdiction provisions as a kind of federal long-arm statute, one patterned after the District of Columbia's own long-arm law); *see also Jurisdiction of U.S. Courts in Suits against Foreign States: Hearings Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary on H.R. 11315,* 94th Cong., 2d Sess. 31 (1976) (statement of Bruno A. Ristau) (noting that this feature of the bill "will insure that only those disputes which have a relation to the United States are litigated in the courts of the United States").

When Congress passed the original FSIA, it was assumed that the exercise of personal jurisdiction over foreign states under the statute always would satisfy the demands of the Constitution. *See* Joseph W. Glannon & Jeffery Atik, *Politics and Personal Jurisdiction: Suing State Sponsors of Terrorism under the 1996 Amendments to the Foreign Sovereign Immunities Act,* 87 GEO. L.J. 675, 681-82 (1999). This assumption proved accurate. *See, e.g., Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1020 (2d Cir.1991); *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1107 n. 5 (5th Cir.1985); *cf. S & Davis Int'l, Inc. v. Republic of Yemen,* 218 F.3d 1292, 1304 (11th Cir.2000) (noting that "the 'direct effects' language of § 1605(a)(2) closely resembles the 'minimum contacts' language of constitutional due process and these two analyses have overlapped"). Indeed, as some courts have noted, the nexus requirements imposed by the original FSIA sometimes exceeded the constitutional standard. *See In re Papandreou,* 139 F.3d 247, 253 (D.C.Cir.1998) ("substantial contact" required by § 1603(e) requires more than the "minimum contacts" necessary to ensure due process).

■ The antiterrorism amendments changed this statutory framework. Under § 1605(a)(7), the only required link between the defendant nation and the territory of the United States is the nationality of the claimant. Thus, § 1605(a)(7) now allows personal jurisdiction to be maintained over defendants in circumstances that do not appear to satisfy the "minimum contacts" requirement of the Due Process Clause. *See* Caplan, *supra,* at 408 ("Under its plain terms, the new law extends extraterritoriality much further than the traditional reach of the *International Shoe [Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ] standard.").

## C. Challenges to the Factual Underpinnings of an FSIA Complaint

■ Before we turn to the due process issue, as well as to the antecedent question of whether plaintiffs have stated valid claims under § 1605(a) for hostage taking and torture, we must first address a separate argument that Libya has advanced on appeal. Libya contends that the District Court erred in assuming the truth of the factual allegations in plaintiffs' complaint for purposes of determining whether it had subject matter jurisdiction. Appellant correctly points out that in *Phoenix Consulting, Inc. v. Republic of Angola,* 216 F.3d 36, 40 (D.C.Cir.2000), we held that when a foreign state defendant raises "a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA," the trial court is required to "go beyond the pleadings and resolve any disputed issues of fact the resolution

of which is necessary to a ruling upon the motion to dismiss."

Libya now claims that it did not engage in the actions described in plaintiffs' complaint. Thus, it contends that we must reverse the District Court's finding of subject matter jurisdiction and remand for further fact-finding on that issue. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 448-49 (D.C.Cir.1990) (holding that where the "conclusory allegations" in a plaintiff's complaint are challenged by a sovereign defendant, "the district court must do more than just look to the pleadings to ascertain whether to grant the motion to dismiss"). We reject this argument.

■ In its original motion to dismiss, Libya specifically stated that, for purposes of that pleading, it was not challenging "the well-pleaded facts in the complaint." *Def.'s Mot. to Dismiss*, at 2 (Jan. 21, 1998). When it renewed this motion, Libya still did not challenge the factual basis of plaintiffs' allegations. Instead, it wrote that, "[e]ven viewed in the light most favorable to the plaintiffs, the facts alleged in the complaint do not establish 'acts of torture' by Libya." *Def.'s Mot. to Dismiss*, at 26 (Feb. 9, 2000). The District Court then properly "[took] the plaintiff's factual allegations as true and determine[d] whether they [brought] the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting*, 216 F.3d at 40. It now falls to this court to review this determination, which we do *de novo*. *See McKesson HBOC*, 271 F.3d at 1105.

## D. Appellate Jurisdiction

■ Price and Frey claim that we lack jurisdiction over Libya's appeal, because the denial of a motion to dismiss for failure to state a claim is neither a "final decision," *see* 28 U.S.C. § 1291, nor the proper subject of an immediate appeal under the

"collateral order" doctrine, *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). These propositions are generally correct; however, insofar as the instant appeal addresses the denial of Libya's motion to dismiss on grounds of foreign sovereign immunity, that question is immediately appealable. *See Princz v. Federal Republic of Germany*, 998 F.2d 1, 1 (D.C.Cir.1993); *Foremost-McKesson*, 905 F.2d at 443 (observing that sovereign immunity confers not merely a defense against liability but a right not to be tried). Thus, an FSIA defendant can take an immediate appeal if the District Court rejects its argument that the facts alleged in the plaintiff's complaint do not bring the case within one of the statute's immunity exceptions.

This is in substance what Libya argued below, and what it now asserts on appeal. *See* Br. for Appellant 24 ("The fact that Price & Frey received a trial and were acquitted and subsequently released, must *deprive the district court of subject matter jurisdiction* as their confinement cannot be considered an act of hostage taking under § 1605(a)(7).") (emphasis added). In other words, the basis for Libya's motion to dismiss and for this appeal was that plaintiffs had not set forth an adequate factual basis for applying the FSIA's torture and hostage taking exceptions. It follows therefore that we have jurisdiction to review this challenge at this time.

## E. Torture

The FSIA's definition of torture derives from the meaning given that term in section 3 of the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), *codified at* 28 U.S.C. § 1350 (note). *See* 28 U.S.C.

§ 1605(e)(1). Section 3(b)(1) of the TVPA defines "torture" to include

> any act, directed against an individual in the offender's custody or physical control, by which *severe* pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual *for such purposes* as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

(Emphases added). This definition, in turn, borrows extensively from the 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 39/46, U.N. GAOR, 39th Sess., Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984) ("Torture Convention"), which the United States signed in 1988 and ratified two years later. *See* H.R. Rep. No. 102-367, Part 1, at 4-5 (1991). Indeed, the TVPA was passed in part to fulfill the Convention's mandate that ratifying nations take action to ensure that torturers are held legally accountable for their actions. *See* S. Rep. No. 102-249, at 3 (1991).

█ While the legislative history of AEDPA gives no indication as to how broadly the definition of torture was intended to sweep, Congress considered this question both in ratifying the Torture Convention and in enacting the TVPA. *See* Beth Stephens & Michael Ratner, International Human Rights Litigation in U.S. Courts 64 & n.4 (1996). Specifically, the drafting histories of both the Convention and the statute address two ambiguities lurking in that definition that must be confronted as we consider whether Price and Frey have alleged facts sufficient to bring this case within the FSIA's definition of torture. The first concerns the meaning of "severe": how much actual pain or suffering must defendants inflict before their conduct rises to the level of torture? The second involves the "for such purposes" language: what must plaintiffs prove about the motivation for the alleged torture if they hope to deprive foreign states of their immunity?

█ The severity requirement is crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term "torture" both connotes and invokes. *See* David P. Stewart, *The Torture Convention and the Reception of International Criminal Law Within the United States*, 15 Nova L. Rev. 449, 455 (1991) (noting that what the Convention forbade was likely already illegal under most domestic legal systems); *Filartiga v. Pena-Irala*, 630 F.2d 876, 890 (2d Cir.1980) ("Among the rights universally proclaimed by all nations . . . is the right to be free of physical torture."); S. Rep. No. 102-249, at 3 ("Official torture . . . violate[s] standards accepted by virtually every nation."). The drafters of the Convention, as well as the Reagan Administration that signed it, the Bush Administration that submitted it to Congress, and the Senate that ultimately ratified it, therefore all sought to ensure that "only acts of a certain gravity shall be considered to constitute torture." J. Herman Burgers & Hans Danelius, The United Nations Convention against Torture 117 (1988); *see also* S. Exec. Rep. No. 101-30, at 14 (1990) ("The term 'torture,' in the United States and international usage, is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application

of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.").

The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture. *See* S. EXEC. REP. No. 101-30, at 15 ("The United States understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering.") (internal quotation marks omitted). This understanding thus makes clear that torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault. Not *all* police brutality, not *every* instance of excessive force used against prisoners, is torture under the FSIA.

■ As to the purposes for which abuse must be inflicted, it is clear from the text of the TVPA that the list of purposes provided was not meant to be exhaustive. *See* Murphy, *supra*, at 27. Instead, this list was included in order to reinforce that torture requires acts both intentional and malicious, and to illustrate the common motivations that cause individuals to engage in torture. *See* S. EXEC. REP. No. 101-30, at 14. The "for such purposes" language thus suggests that any non-enumerated purpose would have to be similar in nature to those mentioned in order to elevate an act of violence into an act of torture. *See* BURGERS & DANELIUS 118-19 (suggesting that there must be some, even if remote, connection with the interests or policies of the State). Moreover, this requirement ensures that, whatever its specific goal, torture can occur under the FSIA only when the production of pain is purposive, and not merely haphazard. In

order to lose its sovereign immunity, a foreign state must impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end.

■ When reviewing a plaintiff's unchallenged factual allegations to determine whether they are sufficient to deprive a foreign state defendant of sovereign immunity, we assume those allegations to be true. *Foremost-McKesson,* 905 F.2d at 440 n. 3. Thus, where the defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief. *See Browning v. Clinton,* 292 F.3d 235, 241–42 (D.C.Cir. 2002). A claimant need not set out all of the precise facts on which the claim is based in order to survive a motion to dismiss. *Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983). However, in light of the serious and far-reaching implications of the 1996 FSIA amendments, it is especially important for the courts to ensure that foreign states are not stripped of their sovereign immunity unless they have been charged with actual torture, and not mere police brutality.

■ In this case, plaintiffs' complaint offers no useful details about the nature of the kicking, clubbing, and beatings that plaintiffs allegedly suffered. As a result, there is no way to determine from the present complaint the severity of plaintiffs' alleged beatings – including their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out – in order to ensure that they satisfy the TVPA's rigorous definition of torture. In short, there is no way to

discern whether plaintiffs' complaint merely alleges police brutality that falls short of torture. Thus, the facts pleaded do not reasonably support a finding that the physical abuse allegedly inflicted by Libya evinced the degree of cruelty necessary to reach a level of torture.

Furthermore, the present complaint says virtually nothing about the purpose of the alleged torture. Plaintiffs seemingly have left it for the courts to conjure some illicit purpose to fill in this pleading gap. Obviously this will not do.

In sum, plaintiffs' allegations of torture as presently stated are insufficient to survive defendant's motion to dismiss. Plaintiffs must allege more than that they were abused. They must demonstrate in their pleadings that Libya's conduct rose to such a level of depravity and caused them such intense pain and suffering as to be properly classified as torture. Although it is far from certain, their complaint hints that they might be able to state a proper claim for torture under the FSIA. Accordingly, we will remand the case to the District Court to allow plaintiffs to attempt to amend their complaint in an effort to satisfy TVPA's stringent definition of torture.

## F. Hostage Taking

As with torture, the FSIA draws its definition of "hostage taking" from an exogenous legal source, here article 1 of the International Convention Against the Taking of Hostages. *See* 28 U.S.C. § 1605(e)(2). This provision reads as follows:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person *in order to compel a third party,* namely, a State, an international governmental organization, a natural or judicial person or a group of persons, *to do or abstain from doing any act as an explicit or implicit*

*condition for the release of the hostage commits the offense of taking hostages within the meaning of the Convention.* (Emphases added). Under no reasonable reading of the plaintiffs' complaint does their admittedly unpleasant imprisonment qualify as hostage taking so defined.

The Convention does not proscribe all detentions, but instead focuses on the intended purpose of the detention. In this case, the complaint asserts only that Libya incarcerated Price and Frey "for the purpose of demonstrating Defendant's support of the government of Iran which held hostages in the U.S. Embassy in Tehran, Iran." Compl., at ¶ 7. Such motivation does not satisfy the Convention's intentionality requirement. The definition speaks in terms of conditions of release; the defendant must have detained the victim in order to compel some particular result, specifically to force a third party either to perform an act otherwise unplanned or to abstain from one otherwise contemplated so as to ensure the freedom of the detainee. Accordingly, detention for the goal of expressing support for illegal behavior – even for behavior that would itself qualify as "hostage taking" – does not constitute the taking of hostages within the meaning of the FSIA.

In this case, the plaintiffs have suggested no demand for *quid pro quo* terms between the government of Libya and a third party whereby Price and Frey would have been released upon the performance or non-performance of any action by that third party. Indeed, even when read most favorably to them, their complaint points to no nexus between what happened to them in Libya and any concrete concession that Libya may have hoped to extract from the outside world. The one purpose that plaintiffs have alleged is plainly inadequate, and they have advanced no others. Their allegation thus falls short of the

standard for hostage taking under § 1605(a)(7).

For these reasons, Libya cannot be stripped of its sovereign immunity based on plaintiffs' allegation of hostage taking. The District Court thus erred in refusing to dismiss this count. Accordingly, we reverse on this point.

## G. Personal Jurisdiction

■ The last question that we face is whether the Due Process Clause is offended by the District Court's assertion of personal jurisdiction over Libya. If, on remand, plaintiffs can state a claim of torture under § 1605(a)(7) sufficient to survive a motion to dismiss, and if they have properly served process on the defendant, personal jurisdiction will be established under the FSIA. *See* 28 U.S.C. § 1330(b); *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n. 11 (D.C.Cir.1987) (noting that under the FSIA, "subject matter jurisdiction plus service of process equals personal jurisdiction"). However, it is well-settled that "a statute cannot grant personal jurisdiction where the Constitution forbids it." *Gilson v. Republic of Ireland*, 682 F.2d 1022, 1028 (D.C.Cir.1982).

■ The Due Process Clause requires that if the defendant "be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). In the absence of such contacts, the liberty interest protected by the Due Process Clause shields the defendant from the burden of litigating in that forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72, 105 S.Ct. 2174, 2181-82, 85 L.Ed.2d 528 (1985). Lib-

ya argues that foreign states, no less than private individuals and corporations, are protected by these constitutional strictures.

In the present case, it is undisputed that Libya has no connection with the District of Columbia or with the United States, except for the alleged fact that it tortured two American citizens in Libya. This would be insufficient to satisfy the usual "minimum contacts" requirement. *See, e.g., IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir.1998) (holding that minimum contacts do not exist in an intentional tort case unless the defendant "*expressly aimed* its tortious conduct at the forum"; the mere fact that the harm caused by the defendant was primarily felt in the forum because the plaintiff resided there is not enough); *Wallace v. Herron*, 778 F.2d 391, 394-95 (7th Cir.1985) (rejecting the suggestion that "any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff"). Therefore, Libya argues, the Fifth Amendment precludes the exercise of personal jurisdiction in this case.

Implicit in Libya's argument is the claim that a foreign state is a "person" within the meaning of the Due Process Clause. *See* U.S. Const. amend. V ("nor shall any person ... be deprived of life, liberty, or property, without due process of law"). In previous cases, we have proceeded *as if* this proposition were true, but we have never so held. *See, e.g., Gilson*, 682 F.2d at 1028 (finding that Ireland had sufficient contacts with the United States to allow for personal jurisdiction without specifically addressing whether it was a person protected by the Fifth Amendment); *Foremost-McKesson*, 905 F.2d at 442 n. 10 (noting, in a case against Iran, the Fifth

Amendment's minimum contacts requirements, but ultimately finding that the defendant had waived any such constitutional defense to personal jurisdiction).

■ Moreover, both the Supreme Court and this court have expressly indicated that the constitutional issue remains an open one. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619, 112 S.Ct. 2160, 2168-69, 119 L.Ed.2d 394 (1992) (assuming without deciding that a foreign state is a person for purposes of the Due Process Clause); *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 124-25 (D.C.Cir.1999) (noting that the view that foreign states are entitled to constitutional due process is merely an "unchallenged assumption"). Now, however, this assumption has been challenged. And, with the issue directly before us, we hold that foreign states are not "persons" protected by the Fifth Amendment.

Our conclusion is based on a number of considerations. First, as the Supreme Court noted in *Will v. Michigan Department of State Police*, there is an "often-expressed understanding that 'in common usage, the term "person" does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it.'" 491 U.S. 58, 64, 109 S.Ct. 2304, 2308, 105 L.Ed.2d 45 (1989) (quoting *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667, 99 S.Ct. 2529, 2537-38, 61 L.Ed.2d 153 (1979)). In the context of a specific statute, "person" may be given a broader meaning. *Compare Will*, 491 U.S. at 71, 109 S.Ct. at 2312 (holding that a State is not a "person" within the meaning of 42 U.S.C. § 1983), *and Breard v. Greene*, 523 U.S. 371, 378, 118 S.Ct. 1352, 1356, 140 L.Ed.2d 529 (1998) (holding that a foreign state is not a "person" entitled to bring suit under § 1983), *with Pfizer v. Government of India*, 434 U.S. 308, 320, 98 S.Ct. 584, 591-92, 54 L.Ed.2d 563 (1978) (holding that a for-eign state is a "person" entitled to sue under the federal antitrust laws). In this case, however, what is at issue is the meaning of the Due Process Clause, not a statutory provision. And, on this score, it is highly significant that in *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24, 86 S.Ct. 803, 815-16, 15 L.Ed.2d 769 (1966), the Court was unequivocal in holding that "the word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union." Therefore, absent some compelling reason to treat foreign sovereigns more favorably than "States of the Union," it would make no sense to view foreign states as "persons" under the Due Process Clause.

Indeed, we think it would be highly incongruous to afford greater Fifth Amendment rights to foreign nations, who are entirely alien to our constitutional system, than are afforded to the states, who help make up the very fabric of that system. The States are integral and active participants in the Constitution's infrastructure, and they both derive important benefits and must abide by significant limitations as a consequence of their participation. *Compare* U.S. CONST. art. IV § 4 ("The United States shall guarantee to every State in this Union a Republican form of Government, and shall protect each of them against Invasion;"), *with id.* at art. VI, cl. 2 ("This Constitution . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Law of the State to the Contrary notwithstanding."), *and id.* at art. 1 § 10 (listing specific acts prohibited to the States). However, a "foreign State lies outside the structure of the Union." *Principality of Monaco v. Mississippi*, 292 U.S. 313, 330, 54 S.Ct. 745, 751, 78 L.Ed. 1282 (1934).

Given this fundamental dichotomy between the constitutional status of foreign states and States within the United States, we cannot perceive why the former should be permitted to avail themselves of the fundamental safeguards of the Due Process Clause if the latter may not.

It is especially significant that the Constitution does not limit foreign states, as it does the States of the Union, in the power they can exert against the United States or its government. Indeed, the federal government cannot invoke the Constitution, save possibly to declare war, to prevent a foreign nation from taking action adverse to the interest of the United States or to compel it to take action favorable to the United States. It would therefore be quite strange to interpret the Due Process Clause as conferring upon Libya rights and protections *against* the power of federal government.

In addition to text and structure, history and tradition support our conclusion. Never has the Supreme Court suggested that foreign nations enjoy rights derived from the Constitution, or that they can use such rights to shield themselves from adverse actions taken by the United States. This is not surprising. Relations between nations in the international community are seldom governed by the domestic law of one state or the other. *See* Lori Fisler Damrosch, *Foreign States and the Constitution*, 73 VA. L. REV. 483, 520 (1987) ("The most a foreign state can demand is that other states observe *international* law, not that they enforce provisions of domestic law."). And legal disputes between the United States and foreign governments are not mediated through the Constitution. *See Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 202 (D.C.Cir. 2001) (recognizing that "sovereign states interact with each other through diplomacy and even coercion in ways not affected by constitutional protections such as the Due Process Clause").

Rather, the federal judiciary has relied on principles of comity and international law to protect foreign governments in the American legal system. This approach recognizes the reality that foreign nations are external to the constitutional compact, and it preserves the flexibility and discretion of the political branches in conducting this country's relations with other nations. *See* Damrosch, *supra*, at 521 (describing the ways in which "the recognition that foreign states and the United States interact as juridical equals on the level of international law and diplomacy outside the constitutional system, with rights and duties on the international plane not deriving from the Constitution, has shaped the Supreme Court's approach to various problems of domestic law"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89, 72 S.Ct. 512, 518-19, 96 L.Ed. 586 (1952) (matters such as the conduct of foreign relations are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").

 An example of this approach is seen with respect to the right of access to the courts. Private individuals have "a constitutional right of access to the courts," *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), that is, the "right to sue and defend in the courts," *Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907). *See also Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974) (holding that this right derives from the Due Process Clause). Foreign states also have been afforded the right to use the courts of the United States to prosecute civil claims "upon the same basis as a domestic corporation or individual might do." *Pfizer*, 434

U.S. at 318-19, 98 S.Ct. at 591; *see also Principality of Monaco*, 292 U.S. at 323 n. 2, 54 S.Ct. at 748 n. 2 ("There is no question but that foreign States may sue private parties in the federal courts."). But the right of access enjoyed by foreign nations derives from "principles of comity," and it is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 408-09, 84 S.Ct. 923, 930, 11 L.Ed.2d 804 (1964) (quoting *Hilton v. Guyot*, 159 U.S. 113, 164-65, 16 S.Ct. 139, 143-44, 40 L.Ed. 95 (1895)). This privilege is not to be denied lightly, because to do so "would manifest a want of comity and friendly feeling." *The Sapphire*, 78 U.S. (11 Wall.) 164, 167, 20 L.Ed. 127 (1870). Nonetheless, foreign nations do not have a *constitutional* right of access to the courts of the United States. Indeed, only nations recognized by and at peace with the United States may avail themselves of our courts, and "it is within the exclusive power of the Executive Branch to determine which nations are entitled to sue." *Pfizer*, 434 U.S. at 319-20, 98 S.Ct. at 591 (noting that the rule is one of "complete judicial deference to the Executive Branch").

While we recognize that the present case implicates not the right of affirmative access to the courts, but rather its reverse – the right not to be haled into court – this does not change the analysis under the Due Process Clause. The personal jurisdiction requirement is not a structural limitation on the power of courts. Rather, "[t]he personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Ins. Corp. of Ire. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). This makes sense, because "[t]he requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause." *Id.* And the "core of the concept" of due process is "to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998). It is thus quite clear that the constitutional law of personal jurisdiction secures interests quite different from those at stake when a sovereign nation such as Libya seeks to defend itself against the prerogatives of a rival government. It therefore follows that foreign states stand on a fundamentally different footing than do private litigants who are compelled to defend themselves in American courts.

■ Unlike private entities, foreign nations are the juridical equals of the government that seeks to assert jurisdiction over them. *See* Damrosch, *supra*, at 519-20 & n. 150 ("Foreign states exist within the United States as coequal sovereigns on the international plane. International law recognizes the juridical equality of each member of the international community, and establishes for all states a series of rights and duties flowing from this principle."). If they believe that they have suffered harm by virtue of being haled into court in the United States, foreign states have available to them a panoply of mechanisms in the international arena through which to seek vindication or redress. *Id.* at 525. These mechanisms, not the Constitution, set the terms by which sovereigns relate to one another. We would break with the norms of international law and the structure of domestic law were we to extend a constitutional rule meant to protect individual liberty so as to frustrate the United

States government's clear statutory command that Libya be subject to the jurisdiction of the federal courts in the circumstances of this case. The constitutional limits that have been placed on the exercise of personal jurisdiction do not limit the prerogative of our nation to authorize legal action against another sovereign. Conferring on Libya the due process trump that it seeks against the authority of the United States is thus not only textually and structurally unsound, but it would distort the very notion of "liberty" that underlies the Due Process Clause.

The distinction between *privileges* conferred on foreign states without reference to the Constitution and corresponding *rights* enjoyed by other entities because of the Constitution extends to sovereign immunity itself. The Supreme Court has made clear that Congress lacks the power under Article I to abrogate the sovereign immunity of the States of the Union. *Alden v. Maine*, 527 U.S. 706, 712, 119 S.Ct. 2240, 2246, 144 L.Ed.2d 636 (1999); *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44, 72-73, 116 S.Ct. 1114, 1131-32, 134 L.Ed.2d 252 (1996). Such immunity from suit, if not *created* by the Constitution, *see Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991), is at least *protected* by it. Thus, the national government is prevented from undoing this immunity except under limited and unusual circumstances. *See, e.g., Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). In contrast, however, nothing in the Constitution limits congressional authority to modify or remove the sovereign immunity that foreign states otherwise enjoy. Instead, like the right of access to courts, such immunity is "a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Verlinden*, 461 U.S. at 486, 103 S.Ct. at 1967.

In short, we are unwilling to interpret the Due Process Clause as conferring rights on foreign nations that States of the Union do not possess. Neither the text of the Constitution, Supreme Court decisions construing the Due Process Clause, nor long standing tradition provide a basis for extending the reach of this constitutional provision for the benefit of foreign states.

Finally, it is worth noting that serious practical problems might arise were we to hold that foreign states may cloak themselves in the protections of the Due Process Clause. For example, the power of Congress and the President to freeze the assets of foreign nations, or to impose economic sanctions on them, could be challenged as deprivations of property without due process of law. The courts would be called upon to adjudicate these sensitive questions, which in turn could tie the hands of the other branches as they sought to respond to foreign policy crises. The Constitution does not command this. *See Regan v. Wald*, 468 U.S. 222, 242, 104 S.Ct. 3026, 3037-38, 82 L.Ed.2d 171 (1984); *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 291 (D.C.Cir.1989) (describing the need for the nation to speak with "a single voice" in foreign affairs); *People's Mojahedin Org. of Iran v. Dep't of State*, 182 F.3d 17, 22 (D.C.Cir.1999) ("No one would suppose that a foreign nation had a due process right to notice and a hearing before the Executive imposed an embargo on it for the purpose of coercing a change in policy.").

■ In sum, we hold that the Fifth Amendment poses no obstacle to the decision of the United States government to subject Libya to personal jurisdiction in the federal courts. Our decision on this point reaches only an actual foreign government; we express no view as to whether other entities that fall within the FSIA's

definition of "foreign state" – including corporations in which a foreign state owns a majority interest, *see* 28 U.S.C. § 1603(b) – could yet be considered persons under the Due Process Clause. We also note that the unavailability of constitutional due process protections will not render foreign states helpless when sued in the United States, for the doctrine of *forum non conveniens* remains fully applicable in FSIA cases. *See Verlinden*, 461 U.S. at 490 n. 15, 103 S.Ct. at 1970 n. 15; *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.*, 760 F.2d 390, 394 (2d Cir.1985) (suggesting that the *forum non conveniens* doctrine helps mitigate the concern that "United States courts will become the courts of choice for local disputes between foreign plaintiffs and foreign sovereign defendants and thus be reduced to international courts of claims") (internal quotation marks omitted).

### III. Conclusion

For the reasons given above, we reverse in part and remand the case to the District Court for further proceedings consistent with this opinion.