# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 5, 2021          Decided August 3, 2021

No. 19-7121

DARIOUSH RADMANESH,
APPELLANT

v.

ISLAMIC REPUBLIC OF IRAN AND IRANIAN (ISLAMIC)
REVOLUTIONARY GUARD CORPS,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01708)

———

*Michael A. Yanof* argued the cause and filed the briefs for appellant. *Marc C. Lenahan*, entered an appearance.

*Diala Alqadi*, Student Counsel, argued the cause for *amicus curiae* in support of the District Court's judgment. With her on the brief were *Erica Hashimoto*, Director, and *Lauren Bateman*, Supervising Attorney, both appointed by the court, and *Jasdeep Kaur*, Student Counsel.

Before: ROGERS and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion of the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: The Foreign Sovereign Immunities Act permits United States citizens to sue designated state sponsors of terrorism for acts of torture or hostage taking. We consider whether the Islamic Republic of Iran, a designated state sponsor of terrorism, committed such acts against appellant Darioush Radmanesh.

I

A

This case arises from hardships that Radmanesh, a United States citizen, endured while living in Iran between 1978 and 1986. For purposes of this case, we will assume the following uncontroverted allegations, which are taken from Radmanesh's declaration in support of his motion for a default judgment.

Radmanesh was born in the United States in 1969. His mother was an American citizen, and his father was an Iranian exchange student. In 1978, the family moved to Iran. Shortly thereafter, the Iranian Revolution fueled virulent anti-American sentiment. In 1979, armed members of the Islamic Revolutionary Guard Corps (IRGC)—a military arm of the Iranian government—stormed into the family home and accused Radmanesh's father of treason. After his father was summarily convicted, the family was threatened with execution unless they remained in Iran and the father trained Iranians to work as engineers.

Over the next several years, Radmanesh was targeted for abuse as an American. He was forced to attend an Iranian-run school, where his classmates would push him to the ground, spit on him, and kick him while chanting "Death to Americans." Members of the Basij—a youth paramilitary

organization operating under the IRGC—often beat Radmanesh on his way home from school and sometimes urinated on him. One beating sent Radmanesh to the hospital with broken ribs, lacerations, and a concussion. At home, Radmanesh watched the IRGC abuse his mother for being American. At age fifteen, Radmanesh was expelled from school for refusing to step on an American flag.

Around September 1986, Radmanesh was conscripted into the Iranian army to fight in the Iran-Iraq War. During the next three months, he went through arduous military training, was sent into combat, and saw many comrades killed in action. Before one mission to destroy an Iraqi ammunition depot, Radmanesh's commander told him that he was being sent to die as a martyr for Islam. During the mission, a commander forced Radmanesh at gunpoint to shoot and kill a sleeping Iraqi soldier at point-blank range.

Radmanesh survived the mission and was sent back to the front lines. In December 1986, he was found on the battlefield lying delirious in a trench. He was taken to a hospital, diagnosed with post-traumatic stress disorder, and sent home for two weeks to recover. While on leave, Radmanesh fled and eventually escaped from Iran and returned to the United States. To this day, he continues to suffer physical, mental, and emotional scars from his years in Iran.

B

In 2017, Radmanesh filed this case against Iran and the IRGC. The complaint raises substantive claims for hostage taking, torture, assault, battery, false imprisonment, and intentional infliction of emotional distress. Neither defendant

appeared, and Radmanesh voluntarily dismissed his claims against the IRGC after being unable to serve it.

Radmanesh moved for a default judgment against Iran. The district court denied the motion and dismissed the complaint based on foreign sovereign immunity. The court reasoned that Radmanesh's declaration, which repeated the allegations in his complaint, failed to establish that this case falls within the terrorism exception to the FSIA.

Radmanesh appealed. We appointed Erica Hashimoto of the Georgetown University Law Center as an amicus to defend the district court's judgment. She and her student counsel have ably discharged their responsibilities.

## II

Under the FSIA, a foreign state "shall be immune from the jurisdiction of the courts of the United States" unless a statutory exception to the immunity applies. 28 U.S.C. § 1604. Radmanesh invokes the FSIA's terrorism exception. As relevant here, it provides that a foreign state is not immune from a claim for money damages "for personal injury or death that was caused by an act of torture … [or] hostage taking" committed by an official of the foreign state "acting within the scope of his or her office." *Id.* § 1605A(a)(1). Moreover, the foreign state must have been designated as a state sponsor of terrorism when the acts giving rise to the claim occurred. *Id.* § 1605A(a)(2)(A)(i)(I). A district court may enter default judgment against an absent foreign sovereign only if the plaintiff establishes his claim "by evidence satisfactory to the court." *Id.* § 1608(e). And because subject-matter jurisdiction "turns on the existence of an exception to foreign sovereign immunity," the plaintiff must also establish "that immunity is unavailable." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461

U.S. 480, 493 n.20 (1983).[1]  We review *de novo* a district court's legal determination regarding the scope of an immunity exception.  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 91 (D.C. Cir. 2002).

Radmanesh has not established that any of the conduct he attributes to Iran falls within the terrorism exception.  For starters, at least some of that conduct occurred before January 23, 1984, when Iran was designated as a state sponsor of terrorism.  *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2,836 (Jan. 23, 1984).  Moreover, some of it may not involve Iranian officials acting within the scope of their authority.  And in any event, the acts alleged do not constitute hostage-taking or torture.  Our analysis focuses on this final point.

A

The FSIA incorporates the definition of "hostage-taking" from Article I of the International Convention Against the Taking of Hostages, which states:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person … in order to compel a third party … to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of … hostage-taking.

International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205, 207; 28 U.S.C.

---

[1] Conversely, because the FSIA's 10-year statute of limitations is a non-jurisdictional affirmative defense, we may not raise it on Iran's behalf.  *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108, 1113 (D.C. Cir. 2019).

§ 1605A(h)(2). This definition "does not proscribe all detentions," but only those intended "to force a third party either to perform an act otherwise unplanned or to abstain from one otherwise contemplated so as to ensure the freedom of the detainee." *Price*, 294 F.3d at 94.

Radmanesh raises two theories of hostage-taking. First, he contends that he was taken hostage when forced to remain in Iran in order to compel his father to train engineers. But we have previously held that "a prohibition on international travel … would not constitute 'hostage taking'" because it does not amount to "seizure" or "detention" under "any ordinary understanding of those terms." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 16 (D.C. Cir. 2015). Radmanesh makes no attempt to distinguish this precedent.[2] Second, Radmanesh contends that he was taken hostage when his military commander ordered him to kill an Iraqi soldier or else be killed himself. This theory lacks "[t]he essential element" of a "third-party compulsion." *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234–35 (D.C. Cir. 2003). For the allegation is that Radmanesh was threatened so that *he*, not a third party, would shoot an enemy soldier.

---

[2] After the district court dismissed his claims, Radmanesh filed a motion to amend the judgment, which made new allegations that he had been not only forced to remain in Iran, but also placed under house arrest. The district court denied the motion and declined to consider these new allegations. Because Radmanesh does not challenge this ruling on appeal, we also do not consider them.

7

B

The FSIA adopts the definition of "torture" in the Torture Victim Protection Act of 1991, which states:

"[T]orture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992); 28 U.S.C. § 1605A(h)(7).

This definition sets forth four elements. *First*, the pain or suffering must be inflicted while the victim is in the offender's "custody or physical control." *Second*, the pain or suffering must be "directed against" the individual, *i.e.*, "the defendant must have targeted the victim." *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1050 (D.C. Cir. 2014). *Third*, the purpose for inflicting the pain or suffering must be one of those mentioned in the statute—to obtain information or a confession, to punish, to intimidate or coerce, or to discriminate—or "any non-enumerated purpose … similar in

nature to those mentioned." *Price*, 294 F.3d at 93. *Fourth*, the pain or suffering inflicted must be "severe."

In *Price*, we explained that the severity requirement is both demanding and important. Invoking plain meaning and the TVPA's legislative history, we held that torture requires "extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." 294 F.3d at 92–93 (cleaned up). Torture covers only conduct "likely already illegal under most domestic legal systems." *Id.* at 92. It does "not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Id.* at 93 ("Not *all* police brutality, not *every* instance of excessive force used against prisoners, is torture under the FSIA."). This "severity requirement is crucial to ensuring that the conduct proscribed by the … TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Id.* at 92.

Our cases have applied the severity requirement with rigor. In *Price*, the plaintiffs alleged that they had been "kicked, clubbed and beaten" by prison guards during custodial interrogations. 294 F.3d at 86 (cleaned up). We held that without further "useful details about the nature of the kicking, clubbing, and beatings"—such as "their frequency, duration, the parts of the body at which they were aimed, and the weapons used to carry them out"—we could not determine whether the beatings were severe enough to satisfy the FSIA's "rigorous definition of torture." *Id.* at 93–94. Likewise, in *Simpson*, the plaintiff alleged that she had been interrogated, held incommunicado, threatened with death, forcibly separated from her husband, and prevented from learning of his welfare and whereabouts. 326 F.3d at 234. We held that these

allegations "certainly reflect a bent toward cruelty," but were "not in themselves so unusually cruel or sufficiently extreme and outrageous as to constitute torture" under the FSIA. *Id.*

Radmanesh's claims are sympathetic, but the abuse inflicted upon him does not amount to torture under these standards. To begin, Radmanesh alleges that he "was often pushed to the ground, spat upon, and then kicked" by Iranian students chanting "Death to Americans." App'x 99. These allegations are less severe than those held insufficient in *Price* and *Simpson*. Radmanesh further alleges that members of the Basij shouted anti-American slogans at him, attacked him, and sometimes pushed him to the ground and urinated on him as he walked home from school. These general allegations are also no worse than those in *Price* and *Simpson*. In addition, the allegation that the Basij "corner[ed]" Radmanesh "on his way home from school," *id.* at 100, cannot fairly be described as involving the kind of "custody or physical control" normally associated with torture. Radmanesh comes closer with a specific allegation that, on one occasion, the Basij punched him in the face, knocked him to the ground, and kicked him all over his body so violently that he required hospitalization and treatment for cracked ribs, contusions, lacerations, and a concussion. *Id.* To be sure, this describes a significant assault inflicting significant injuries. But Radmanesh does not point us to any case holding that a one-time, outdoor beating like this is both severe enough, and involves sufficient custody or physical control, to amount to torture. In fact, at oral argument, Radmanesh's counsel conceded that this one incident did not by itself amount to torture.[3]

Radmanesh relies most heavily on his experiences in the Iranian military, especially what he characterizes as a kill-or-

---

[3] Radmanesh alleges that his mother was routinely mocked and cursed and, "on occasion," was beaten. App'x 100. This allegation

be-killed order. But Radmanesh does not allege the necessary intentionality—that Iran conscripted him, sent him into battle, and ordered him to kill an enemy soldier for the purpose of inflicting severe pain and suffering *on him*. Instead, the far more likely inference is that Iran took these actions as part of an ongoing war with Iraq—and that Radmanesh suffered as an "unavoidable incident" to that end. *Price*, 294 F.3d at 93. Nor do Radmanesh's wartime experiences meet the severity requirement for torture. Conscription is hardly "extreme and outrageous" conduct that warrants "universal condemnation." *Id.* at 92. To the contrary, it is constitutional under United States law, *United States v. Williams*, 302 U.S. 46, 48 (1937), and not uncommon throughout the world.[4] And orders to use military force are the natural consequence of wartime conscription. Radmanesh objects that killing a *sleeping* enemy soldier constitutes a war crime. But he cites no authority for that proposition, which is contrary to the views of the Department of Defense. *See* Dep't of Def., *Law of War Manual* 220–21 (2015) ("combatants who are standing in a mess line, engaged in recreational activities, or sleeping remain the lawful object of attack"). What Radmanesh endured during the Iran-Iraq War was thus no different from the hardships that soldiers routinely suffer during wartime. And it was decidedly different

---

is too vague to establish the severity requirement as elaborated in *Price* and *Simpson*. In addition, Radmanesh does not allege that his mother was abused for the purpose of causing *him* severe pain or suffering.

[4] Countries including Brazil, Greece, Israel, Mexico, and South Korea currently conscript members of their armed forces. *The World Factbook: Military Service Age and Obligation*, CIA (2021), https://www.cia.gov/the-world-factbook/field/military-service-age-and-obligation.

11

from the kinds of extreme practices that we have said would amount to torture.

## III

Because the terrorism exception to the FSIA does not apply to this case, the district court properly dismissed the case for lack of subject-matter jurisdiction.

*Affirmed.*