**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
HAN KIM, <u>et al.</u>,          )
                                )
          Plaintiffs,           )
                                )
          v.                    )     Civil Action No. 09-648 (RWR)
                                )
DEMOCRATIC PEOPLE'S REPUBLIC     )
of KOREA, <u>et al.</u>,         )
                                )
          Defendants.           )
_____)

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Han Kim ("Han") and Yong Seok Kim ("Yong") bring this civil action under the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c), seeking damages against officials, employees and agents of defendant Democratic People's Republic of Korea ("DPRK") in connection with the January 16, 2000 abduction of Reverend Kim Dong Shik ("Reverend Kim"), who is Han's father and Yong's brother. Following his abduction, Reverend Kim was forcibly transferred to North Korea where the plaintiffs allege he was repeatedly tortured by officials, employees and agents of DPRK.

Plaintiffs filed suit and served DPRK following the requirements of 28 U.S.C. § 1608(a)-(b). DPRK failed to answer or otherwise respond to the complaint, and plaintiffs secured entry of default under Fed. R. Civ. P. 55(a). The plaintiffs then moved for default judgment and have submitted proposed

findings of fact, along with supporting declarations and documentary evidence, and proposed conclusions of law.

The FSIA permits courts to exercise subject matter jurisdiction and enter judgments of liability against foreign states only where a plaintiff pleads and produces satisfactory evidence that a foreign state's conduct falls within one of the enumerated exceptions to sovereign immunity. 28 U.S.C. § 1605A(a), (c). The plaintiffs here rely on the exception for torture, arguing that "[t]he evidence submitted demonstrates that it is far more likely than not that Reverend Kim suffered and continues to suffer the torture and brutal conditions meted out to all 'enemies' of the DPRK unfortunate enough to fall into the hands of the DPRK's security services." Pls.' Proposed Findings of Facts and Conclusions of Law ("Pls.' Proposed Facts") at 42. However, plaintiffs' evidence regarding DPRK's alleged treatment of Reverend Kim appears insufficient to meet the high standard recognized in this circuit that is set by the FSIA's definition of torture. Because the FSIA precludes jurisdiction over this action against a foreign sovereign for conduct not shown by satisfactory evidence to meet the high standard set for proof of torture, the plaintiffs' motion for default judgment will be denied but the case will be certified for an interlocutory appeal.

DISCUSSION

I.   JURISDICTION AND LIABILITY UNDER THE FSIA

Before Congress amended the FSIA in 2008 to add the § 1605A(c) private right of action, the D.C. Circuit explained that at base, "[t]he FSIA is undoubtedly a jurisdictional statute which, in specified cases, eliminates foreign sovereign immunity and opens the door to subject matter jurisdiction in the federal courts." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 87 (D.C. Cir. 2002); see also Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1099 (D.C. Cir. 1982) ("[T]he absence of immunity is a condition to the presence of subject matter jurisdiction."). The door is opened only for cases that fall into one of the statute's specifically enumerated exceptions. Here, Han and Yong rely on the exception eliminating foreign sovereign immunity in cases "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, [or] extrajudicial killing, . . . if such act . . . is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1). The FSIA imposes the additional jurisdictional requirements that the foreign state have been designated as a state sponsor of terrorism during a specified period, that the claimant or victim have been a United States national at the time

of the torture, and that the foreign state have been afforded a reasonable opportunity to arbitrate the claim. 28 U.S.C. § 1605A(a)(2). Section 1605A(c) provides the private right of action for a U.S. citizen against such a foreign state for personal injury or death caused by an act of torture engaged in by the foreign state's officials acting in their official capacity. 28 U.S.C. § 1605A(c). In actions under this provision, "a foreign state shall be vicariously liable for the acts of its officers, employees, or agents." Id.

Because plaintiffs must allege the elements of a claim under § 1605A(c) in order to meet the requirements for waiver of foreign sovereign immunity, liability will exist whenever the jurisdictional requirements of § 1605A(a) are proven. See Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 155 (D.D.C. 2010) ("[T]he § 1605A(c) cause of action is fulfilled by demonstrating that the foreign sovereign performed acts described in subsection (a)(1) of § 1605A, which addresses immunity and subject matter jurisdiction. . . . Although an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action."); see also Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 64-69 (D.D.C. 2008) (explaining that § 1605A(c) provides a

private right of action where subject matter jurisdiction exists under § 1605A(a)).

The FSIA adopts the definition of torture contained in section 3 of the Torture Victims Protection Act ("TVPA"). 28 U.S.C. § 1605A(h)(7) (citing 28 U.S.C. § 1350 note). The TVPA defines torture as

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

TVPA, Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992).

The amended complaint also alleges that Reverend Kim was "tortured to death by officers, employees and agents of defendant North Korea[,]" Am. Compl. ¶ 27, and that Reverend Kim's "murder" thus qualifies under 28 U.S.C. § 1605A as an extrajudicial killing, id. ¶ 33. The FSIA adopts the definition of extrajudicial killing contained in the TVPA: "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992).

Courts have found that extrajudicial killing occurs, for example, where a defendant deliberately kills individuals by a targeted or deliberate bombing, see, e.g., Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 150 (D.D.C. 2011); Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 74 (D.D.C. 2010), or deliberately assassinates or executes an individual, see Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 839-40 (D.C. Cir. 2009); Kilburn, 699 F. Supp. 2d at 152-53; Bakhtiar v. Islamic Republic of Iran, 571 F. Supp. 2d 27, 34 (D.D.C. 2008). Here, plaintiffs have not alleged a targeted bombing or a deliberate execution. Instead, by alleging that Reverend Kim was tortured to death and that this murder qualifies as an extrajudicial killing, the plaintiffs must show that North Korean agents deliberately killed Reverend Kim by torturing him. Thus, the plaintiffs' extrajudicial killing claim relies squarely upon an adequate showing that Reverend Kim was tortured.

The D.C. Circuit has emphasized the high standard that the statutory definition of torture imposes. In Price, an interlocutory appeal of a district court order rejecting Libya's claim of sovereign immunity in its motion to dismiss, the court of appeals considered the sufficiency of the complaint's allegations of torture. The circuit's reasoning merits recounting in some detail:

The severity requirement is crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes . . . . [O]nly acts of a certain gravity shall be considered to constitute torture . . . . The term 'torture,' . . . is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain . . . . The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim. The more intense, lasting, or heinous the agony, the more likely it is to be torture . . . . [I]n order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, specifically intended to inflict excruciating and agonizing physical or mental pain or suffering . . . . [T]orture does not automatically result whenever individuals in official custody are subjected even to direct physical assault. Not all police brutality, not every instance of excessive force used against prisoners, is torture under the FSIA . . . . [I]t is especially important for the courts to ensure that foreign states are not stripped of their sovereign immunity unless they have been charged with actual torture, and not mere police brutality.

Price, 294 F.3d at 92-93 (internal quotations and citations omitted). In addition, for abuse to constitute torture it must be inflicted intentionally, not merely incidentally. Id. at 93 ("In order to lose its sovereign immunity, a foreign state must impose suffering cruelly and deliberately, rather than as the unforeseen or unavoidable incident of some legitimate end.").

In light of this meaning, the court found insufficient to waive sovereign immunity allegations that plaintiffs were held

for approximately three months in a political prison where they allegedly "endured deplorable conditions while incarcerated, including urine-soaked mattresses, a cramped cell with substandard plumbing that they were forced to share with seven other inmates, a lack of medical care, and inadequate food," and further "were kicked, clubbed and beaten by prison guards, and interrogated and subjected to physical, mental and verbal abuse." Id. at 86 (internal quotations omitted). The Price court further found the complaint inadequate because it "says virtually nothing about the purpose of the alleged torture." Id. at 94; see also Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d 230, 234 (D.C. Cir. 2003) (finding allegations of forcibly removing passenger from cruise ship, holding passenger incommunicado and threatening her with death if she moved from her quarters did not rise to the level of torture under the FSIA and state a claim).

Price considered the sufficiency of torture allegations when the defendants moved to dismiss the complaint for lack of subject matter jurisdiction. Price's reasoning is equally instructive for determining whether a plaintiff in a default proceeding has established subject matter jurisdiction. When a court reviews unchallenged factual allegations on a motion to dismiss, the allegations are assumed to be true for purposes of assessing

subject matter jurisdiction.  Price, 294 F.3d at 93.  Similarly, for the purposes of examining subject matter jurisdiction on a motion for entry of default under the FSIA, courts accept the plaintiffs' factual allegations as true.  Sisso v. Islamic Republic of Iran, 448 F. Supp. 2d 76, 81 & n.5 (D.D.C. 2006) (reasoning on motion for entry of default in FSIA proceeding that court was "preclude[d] . . . *at this stage of the litigation* from making factual findings that are inconsistent with the allegations of the complaint" and explicitly accepted "all of plaintiffs' factual allegations as true[.]").  However, to establish subject matter jurisdiction, the allegations must be sufficiently detailed.  At the pleadings stage, the Price court accordingly found inadequate the allegations before it, holding that

> plaintiffs' complaint offers no useful details about
> the nature of the kicking, clubbing, and beatings that
> plaintiffs allegedly suffered.  As a result, there is
> no way to determine from the present complaint the
> severity of plaintiffs' alleged beatings -- including
> their frequency, duration, the parts of the body at
> which they were aimed, and the weapons used to carry
> them out -- in order to ensure that they satisfy the
> TVPA's rigorous definition of torture.

Price, 294 F.3d at 93.  Beyond the pleadings stage, plaintiffs "have to prove the merits of their claims before they can obtain a default *judgment*" and "the evidence they present will have to provide support" for the theories of liability they allege.

Sisso, 448 F. Supp. 2d at 79 n.2.  It follows that plaintiffs must provide sufficiently detailed proof of their allegations that DPRK agents tortured Reverend Kim in order to ensure that the conduct "satisf[ies] the TVPA's rigorous definition of torture."  Price, 294 F.3d at 93.

## II.  STANDARDS FOR DEFAULT JUDGMENT

Default judgment against a foreign state shall be entered only where a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court."  28 U.S.C. § 1608(e).  The "satisfactory to the court" standard is identical to the standard for entering default judgment against the United States under Fed. R. Civ. P. 55(d) (requiring claimant to "establish[] a claim or right to relief by evidence that satisfies the court").  Hill v. Republic of Iraq, 328 F.3d 680, 683 (D.C. Cir. 2003) (citing H.R. Rep. No. 94-1487, at 26 (1976)).  Neither standard, however, is easily defined.  See Smith ex rel. Smith v. Islamic Emirate of Afghanistan, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (observing that "[t]he issue appears to have defied definitive resolution largely because in most cases the evidence of the defaulting defendant's liability is quite compelling and thus the matter can be decided without a more concise meaning of 'evidence satisfactory to the court'").  The D.C. Circuit has not addressed the question, and lower courts

have articulated varying rationales for what quantum of evidence is "satisfactory."

Some courts in FSIA default proceedings have found to be "satisfactory" evidence that they described as "clear and convincing." See, e.g., Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 16 (D.D.C. 2002) (finding jurisdictional facts "established by clear and convincing evidence, which would have been sufficient to establish a prima facie case in a contested proceeding"); Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 3 (D.D.C. 2001) (same). But the reasoning of these cases suggests strongly -- and in some cases indicates explicitly -- that clear and convincing evidence was considered a sufficient, rather than a necessary, quantum of proof. See, e.g., Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 269 (D.D.C. 2003) (concluding that "the plaintiffs have gone beyond the necessary burden of 'evidence satisfactory to the court' and have proven each element by clear and convincing evidence").

Other courts have drawn an analogy between the FSIA default standard and that for judgment as a matter of law, either after a jury trial or on summary judgment. One court held that the FSIA default standard "call[s] for proof by evidence of a nature and quality sufficient to support summary judgment under Fed. R. Civ.

P. 56, namely, oral or written testimony under oath, made upon personal knowledge by witnesses competent to testify to the matters stated therein." Hill v. Republic of Iraq, 175 F. Supp. 2d 36, 38 n.4 (D.D.C. 2001) (referring to then-current Rule 56(e)).[1] In Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 98 (D.D.C. 2002), the court considered the Hill standard, among others, but then purported to opt for the standard for judgment as a matter of law after a jury trial, set forth in Federal Rule of Civil Procedure 50(a), which the court described as "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." Id. at 98.[2] Several subsequent courts, see, e.g., Gates, 580 F. Supp. 2d at 63, have adopted as the

---

[1] This case was reversed in part by Hill v. Republic of Iraq, 328 F.3d 680 (D.C. Cir. 2003). The D.C. Circuit rejected the burden of proof on damages for default judgment that the district court articulated, but "did not address the question of the FSIA's plaintiff's burden on proof on liability." Hill, 328 F.3d at 683-84.

[2] The Federal Rule of Civil Procedure 50(a) standard is more stringent than the Ungar court's formulation suggests. Judgment as a matter of law against a party may be granted only if "the court finds that a reasonable jury would *not* have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (holding that the summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict"). In this light, the standards actually applied in Hill and Ungar are virtually identical.

standard that the plaintiffs must put forth a "legally sufficient *prima facie* case." See, e.g., Kilburn, 699 F. Supp. 2d at 150.

Interpreting the "satisfactory to the court" standard to require a legally sufficient *prima facie* case best accounts for the posture of default proceedings under the FSIA. Where the defendant has not participated in the proceedings and there has been no opportunity for discovery, plaintiffs cannot be expected to meet a typical standard for judgment as a matter of law. However, the plaintiff's evidence must be rigorous enough to support the facts necessary for jurisdiction.

In FSIA default proceedings, "the court may accept as true the plaintiffs' uncontroverted evidence." Wachsman v. Islamic Republic of Iran, 603 F. Supp. 2d 148, 155 (D.D.C. 2009) (internal quotations omitted) (quoting Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)); see also Gates, 580 F. Supp. 2d at 63 (same); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1243 (S.D. Fla. 1997) (same). The evidence provided, however, is subject to the Federal Rules of Evidence. See, e.g., Daliberti v. Republic of Iraq, 146 F. Supp. 2d at 21 n.1 (D.D.C. 2001) (noting that "[i]n the absence of defense counsel, the Court used particular care to draw the . . . findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence"). Hearsay

evidence therefore is normally inadmissible because it lacks sufficient indicia of reliability.  Expert witnesses, however, may rely on hearsay evidence to reach their conclusions.  Fed. R. Evid. 703.  Plaintiffs may present their evidence in the form of affidavits or declarations, see Campuzano, 281 F. Supp. 2d at 268 (citing Weinstein, 184 F. Supp. 2d at 19), and an evidentiary hearing is not required before a default judgment against a foreign state is entered.  See Ben-Rafael v. Islamic Republic of Iran, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).

III. PLAINTIFFS' EVIDENCE

Plaintiffs have submitted their own declarations, as well as declarations from family member Dani Butler, and from multiple experts on North Korea.  Exhibits include congressional resolutions relating to Reverend Kim's abduction, and press materials, book excerpts and reports from human rights organizations and the U.S. State Department about North Korea. The plaintiffs rely in particular on the decision of a South Korean court that tried and convicted a DPRK intelligence agent for crimes including the abduction of Reverend Kim.  Plaintiffs have provided a sworn English translation of that decision.  See Declaration of J.D. Kim (certifying translation of Decision of Seoul Joong Ang Ji Bang Court, Criminal Part 23 ("South Korean court decision")).  The judgment of the South Korean court is a

proper subject of judicial notice under Federal Rule of Evidence 201 to establish the fact of foreign litigation and the resulting actions of the foreign court.  Fed. R. Evid. 201 (permitting judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned); see, e.g., Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd., 154 F. Supp. 2d 682, 689 (S.D.N.Y. 2001) (taking judicial notice of foreign court judgment); Luxpro Corp. v. Apple Inc., No. C 10-03058 JSW, 2011 WL 1086027, at *3 (N.D. Cal. March 24, 2011) (same).  A declaration certifying under penalty of perjury that the translation of the decision is true and correct accompanies the decision and suffices to establish its accuracy.  See 28 U.S.C. § 1746.  Recited below, without an attempt to parse the admissibility of all of it, is the evidence presented by the plaintiffs.

North Korean refugees who were able to escape to China would stay in secret safe-houses that non-governmental organizations and religious humanitarian groups had established or that Chinese locals in the area with ethnic Korean descent would support.  Report of Yoshikuni Yamamoto ("Yamamoto Decl.") ¶ 17.  In response, the DPRK established a network of local agents in China under DPRK's security services to abduct

defectors and the humanitarian workers who assisted them.  Id.
¶¶ 18, 23.  On September 17, 2002, DPRK leader Kim Jong-Il
admitted publicly to Prime Minister Koizumi of Japan that DPRK
security services had engaged in kidnapping Japanese citizens
between 1977 and 1983.  Declaration of Ernest C. Downs ("Downs
Decl.") ¶ 20.

In 1993, Reverend Kim moved to China to work as a missionary
providing humanitarian and religious services to the families of
North Korean defectors and refugees who had fled across the Sino-
Korean border seeking asylum.  Yamamoto Decl. ¶ 20.  He had
previously worked with the Special Olympics in China and worked
to raise money for medical supplies for needy children.  He
learned of the plight of North Korean refugees and at once
committed himself to aid this disadvantaged community.
Declaration of Han Kim ("Han Decl.") ¶¶ 19, 21.  Reverend Kim set
up numerous refugee shelters and a school for expatriate North
Korean children and handicapped persons in the Chinese town of
Yanji.  He named the school the "School of Love."  Yamamoto Decl.
¶ 20.

DPRK intelligence agent Hua was convicted on April 21, 2005
by a South Korean Court in Seoul, for his involvement in planning
and executing various abductions of civilians from China to North
Korea following the instructions of a senior DPRK intelligence

official.  South Korean court decision at 1.  One of the crimes for which Hua was convicted was his direct involvement in planning and carrying out the abduction of Reverend Kim.  Id. at 2.  Hua was sentenced to ten years imprisonment.  Id. at 1.  The plaintiffs allege that agents prosecuted for abducting Reverend Kim provided information concerning Reverend Kim's torture in North Korea, and cite to the South Korean court decision for support.  Pls.' Proposed Facts at 8; Revised Proposed Findings of Facts and Conclusions of Law at 18.  However, the court decision makes no reference to Reverend Kim being tortured in North Korea.

Members of the United States Congress have investigated the DPRK policy of abducting foreigners and have issued various resolutions regarding the issue.  On June 11, 2002, the House of Representatives issued a resolution urging the governments of the United States, South Korea and China to seek a full accounting from the DPRK regarding the whereabouts of Reverend Kim.  Downs Decl. ¶ 25, Ex. A.  On July 11, 2005, the House of Representatives issued a resolution condemning the DPRK's use of abductions and demanding the return of individuals being held in North Korea.  Id. ¶ 25, Ex. C.  On January 28, 2005, an Illinois congressional delegation, including then-United States Senator Barack Obama, sent a letter to North Korean Ambassador to the United Nations Pak Gil Yon, which specifically asked that North

Korea forthwith investigate the circumstances of Reverend Kim's abduction and fate, and which stated that its signatories would not support the removal of the DPRK from the State Department's list of State Sponsors of Terrorism until the whereabouts of Reverend Kim had been made known. Id. ¶ 25, Ex. E. This letter was followed by a letter from Representative Henry Hyde in his capacity as the Chairman of the House Committee on International Relations, dated November 4, 2005, after the Illinois congressional delegation had returned from a trip to Japan. Id. ¶ 25, Ex. F.

A recently declassified internal State Department cable dated February 3, 2000, from representatives stationed in Seoul communicating with headquarters in Washington, D.C., states that a local Chinese paper reported that Chinese investigators had "strong evidence" that Reverend Kim was kidnapped from China by DPRK agents who had crossed over into China in late December to plan the abduction. Id. ¶ 26, Ex. G. The cable -- authored a mere two weeks after Reverend Kim's abduction -- further reported that ten people were involved in Reverend Kim's kidnapping, including a couple posing as North Korean defectors, and that Reverend Kim was held hostage in China before being transported into North Korea by his captors. Id. The State Department's 2003 country report on North Korea discusses North Korea's

responsibility for disappearances and refers to "unconfirmed reports that in January 2000 North Korean agents kidnaped a South Korean citizen, Reverend Kim Dong Shik, in China and took him to North Korea." Decl. of Robert Tolchin, Dkt. No. 37 at 3. The State Department also recounts that North Korea engaged in torture including "severe beatings, electric shock, prolonged periods of exposure, humiliations such as public nakedness, and confinement to small 'punishment cells[.]" Id. at 4. The report describes harsh prison conditions in North Korea where "starvation and executions were common" and former prisoners reported severe beatings and "torture involving water forced into a victim's stomach with a rubber hose and pumped out by guards jumping on a board placed across the victim's abdomen[.]" Id. A 2009 State Department country report on human rights practices in the DPRK states that the North Korean government was responsible for disappearances and that "[i]n 2008 the media reported South Korean missionary Kim Dong-shik had most likely died within a year of his 2000 disappearance near the China-DPRK border." Decl. of Robert Tolchin, Dkt. No. 38 at 3. The 2009 report reiterates the reported torture methods and the harsh conditions of the prisons in North Korea. Id. at 3-4. However, the State Department cable and reports do not provide any first-hand accounts of Reverend Kim's treatment, or address the nature or

severity of any torture Reverend Kim suffered, or specify the frequency or duration of the acts of torture or the parts of the body at which they were aimed or any weapons used to carry them out.

Expert research on human rights abuses in North Korea has reported widespread and systematic repression by DPRK operatives of DPRK citizens and foreign nationals, specifically by means of forced abductions and confinement in *kwan-li-so*, or political penal-labor colonies. The reports are based on first-hand accounts and satellite photography, among other data. Declaration of Professor David Hawk ("Hawk Decl.") ¶¶ 8-13. Professor David Hawk has expertise in human rights in North Korea, has published extensively on that issue, and has interviewed scores of former prisoners with first-hand accounts of treatment in North Korean camps. He declared that prisoners of the penal colonies face harsh conditions and treatment, including below-subsistence food rations, back-breaking forced physical labor, brutal beatings, long-term solitary confinement, rape, and forced abortion. Id. ¶¶ 14-19. Prisoners are forced to perform labor twelve or more hours a day, seven days a week, and receive only enough food to be kept on the verge of starvation. Id. ¶ 14. Prisoners often endure "long-term solitary confinement in punishment cells which do not have enough

space for a person to completely lie down or stand up, causing inmates to experience a loss of circulation and atrophy of legs, and often leading to death within several weeks." Id. ¶ 15. According to Hawk, "[a]ttempted escapees are automatically executed and other 'major' rule-breakers are publicly executed by hanging or firing squad in front of the assembled prisoners of that section of the camp." Id. "Many inmates cannot withstand the harsh conditions of their imprisonment and a significant number die within a year of their arrival to the kwan-li-so. A large number of those who survive develop permanent disabilities -- signs of premature aging, hunchbacks and other physical deformities due to the brutal work conditions and cell sizes." Id. ¶ 16. Hawk stated that a defining characteristic of DPRK's political penal-labor colonies is that "prisoners are not formally arrested, charged (or even told of their offense), or tried in any sort of judicial procedure." Id. ¶ 11.

Hawk said

[w]hile I do not have any firsthand knowledge about Reverend Kim's case specifically, given my extensive experience with the DPRK and the manner in which abductees repatriated from China were usually treated, it is likely that [Reverend Kim] would have been initially held in a *ku-ryu-jang*, or a DPRK police detention and interrogation facility, before being transferred to a *kwan-li-so*. It also seems likely to me that Reverend Kim, at a minimum, would have been subjected to the harsh treatment afforded to all of its prisoners. But because Reverend Kim was such a valuable target of the DPRK and so much planning,

> effort and other resources had gone into his abduction, it is clear to me that Reverend Kim was subjected to additional brutality.

Id. ¶ 20.  Reports and concerns about Reverend Kim's treatment have circulated widely enough that he would have been more likely to be viewed by the DPRK as a high-value target warranting harsh treatment.  Id.  Hawk "believe[s] that the various reports of [Reverend Kim's] torture and eventual starvation, from the accounts of other prisoners, are likely to be reliable and accurately describe how Reverend Kim was treated by his captors from the time he was abducted and incarcerated until his untimely death."  Id.  Hawk does not detail from the reports the nature or severity of the torture Reverend Kim suffered, or the frequency or duration of the acts of torture or the parts of the body at which they were aimed or any weapons used to carry them out.

Ernest C. Downs, a former senior official of the U.S. Department of Defense who served from 2001 to 2008 on the board of the United States Committee for Human Rights in North Korea, stated that it is "clear . . . that [Reverend Kim] was abducted by DPRK agents from China and forcibly brought to North Korea[.]" Downs Decl. ¶ 33.  According to Downs, DPRK agents have specifically abducted and imprisoned people who have assisted North Korean defectors as well as Christian missionaries. Supplemental Declaration of Ernest C. Downs ("Downs Supp. Decl.")

¶ 6(b)-(d). Because Reverend Kim assisted North Korean defectors and was a Christian missionary, he was likely a "valuable and important target to the government and ruling party of the DPRK." Id. ¶ 6(a)-(c). Based on the testimony of other North Korean prisoners, Downs states that prisoners are forced to labor for more than twelve hours per day, sometimes sixteen hours, and the failure to meet production quotas leads to "additional hard labor, less food, and exceptionally painful physical punishment." Downs Decl. ¶ 11; see also Downs Supp. Decl. ¶ 11. Thus, "[p]risoners in North Korea's political prisons do not often survive." Downs Supp. Decl. ¶ 7. Downs states that he is aware of the testimony of 1000 former North Korean prisoners and Downs "does not know of any case in which the former prisoner was *not* subjected to torture while in the prison camp." Downs Supp. Decl. ¶ 10. Downs provides numerous examples from former prisoners describing inmate mistreatment in DPRK prisons and facilities. In particular, Downs submits an excerpt from Hawk's book The Hidden Gulag which recounts inmates who were subject to burnings, skin piercing, water torture, being hung by wrists or upside-down, sleep deprivation, food deprivation, facial and shin beatings with rifle butts, whippings with belts, beatings in the legs with a wooden stave, undersized punishment cells where detainees could not stand up or lie down and placement in

punishment cells for a week or more.  Id., Ex. 1 at 148-52.
Downs also attaches an account of a prisoner who was hung by his
hands and feet, stabbed in the lower abdomen and held over a fire
until he lost consciousness.  Id., Ex. 2 at 57-58.

Downs also opines that "Reverend Kim's killing was motivated
by political considerations."  Downs Decl. ¶ 7.  In his opinion,
"a foreigner abducted by the DPRK for political purposes, such as
Reverend Kim, after eleven years would still either be
languishing in a North Korea prison camp or would have already
been killed."  Id. ¶ 34.  He "believe[s] that credible
information on [Reverend Kim's] treatment in North Korea has been
obtained from defectors."  Id.  He states that Reverend Kim
probably was subjected to "severe beatings while in stress
positions (such as while suspended from the ceiling), near
starvation, and forced physical exertion to the point of absolute
physical exhaustion."  Downs Supp. Decl. ¶ 9.  In addition, Downs
asserts that he is certain that "Reverend Kim has been subject to
exceptionally painful, brutal, and outrageous treatment while in
prison."  Id. ¶ 8.  Downs also states that "[c]redible sources
have reported that Reverend Kim died as a result of his torture
and malnutrition."  Id. ¶ 6(i).  Thus, Downs concludes that
Reverend Kim's "death resulted from torture and malnutrition
deliberately caused by his North Korean captors."  Id. ¶ 13.

Downs neither identifies the former prisoners, the defectors or other credible sources for these conclusions, nor reveals their basis of knowledge about Reverend Kim, nor says he has spoken with any of them.  Downs does not provide details from the credible information received concerning the severity of Reverend Kim's beatings, such as their frequency, duration, the parts of the body at which they were aimed, or the weapons used to carry them out.

Do Hee-Youn, a member of a South Korea-based human rights organization, heard "through the information net" that Reverend Kim died in North Korea as a result of torture and malnutrition in February 2001.  Declaration of Do Hee-Youn ("Do Hee-Youn Decl.") ¶ 13.  Yoshikuni Yamamoto, a researcher at a human rights organization in Washington, DC, stated generally that "it was reported" that Reverend Kim was tortured after refusing to collaborate and that he died in February 2001 and was buried in District 91 military training base in Sangwon-ri near Pyongyang. Yamamoto Decl. ¶ 22.  Neither declaration supplied details about the nature of the reported torture.

Human Rights Watch released a 2007 report discussing the mistreatment of prisoners at detention facilities in North Korea. This report states that

> prisoners are subject to strip searches, verbal abuse
> and threats, beatings, forced labor, and lack of food

and medicine, among other abuses.  Torture and other cruel and inhuman treatment appears widespread and can occur throughout the process of incarceration in North Korea[.]

North Korea: Harsher Policies against Border-Crossers, Dkt. No. 35-1 at 8.  In particular, the report includes accounts from former prisoners who state that the guards

would make [prisoners] sit down and stand up repeatedly until [they] collapsed, or forced [them] to hang onto cell bars or bang [their] heads onto cell bars. . . . Guards beat people all the time -- they used sticks or belts.  They also slapped or kicked inmates for disobedience.

Id.  Similarly, the United Nations Special Rapporteur on the situation of human rights in the DPRK released a report which described what it called DPRK's record of torture and inhuman treatment, arbitrary detention and use of prison camps.  Pls.' Supp. Submission of New Auth., Ex. 1, Human Rights Council, Rep. of the Special Rapporteur on the situation of human rights in the DPRK, 22d Sess., U.N. Doc. A/HRC/22/57 (Feb. 1, 2013).  This report stated that, in 2007, there were reports that DPRK authorities engaged in "torture, public executions, and persecution of political dissidents."  Id., Annex 1 ¶ 22.  In 2008, the Secretary-General stated that reports from DPRK "continue to indicate trends of torture, inhumane conditions of detention, public execution, ill-treatment of refugees" and the Special Rapporteur stated that

the harsh conditions imposed by the criminal justice system and related detention give rise to a plethora of abuses, including torture and cruel, inhuman and degrading treatment. The abuses are ubiquitous, and include degrading treatment of deceased persons.

Id., Annex 1 ¶ 23. The UN Special Rapporteur cites 2011 reports which state that DPRK correctional officers beat inmates and that torture was occurring at various camps in the DPRK. Id., Annex 1 ¶¶ 25-26. In addition, "[t]he Secretary-General noted in 2012 that some reports also indicate the existence of prison camps where torture and execution are widespread." Id., Annex 1 ¶ 27. The report identifies the political labor camps and states that the Special Rapporteur has consistently expressed concern about "unreasonable and abusive punishments" and "torture and detention without due process of law" and the "harsh conditions" in the camps where "no clothing is provided" and inmates are "expected to work long hours performing manual labour." Id., Annex 1 ¶¶ 48-51, 54. Neither report provides any first-hand knowledge of Reverend Kim's mistreatment. The reports do not detail the frequency or duration of the acts of torture at the DPRK prison camps.

Plaintiffs cite an excerpt from Melanie Kirkpatrick's 2012 book Escape from North Korea that states that Reverend Kim was tortured and murdered by the North Koreans. Pls.' Supp. Submission of New Authority, Dkt. No. 55, Ex. 1 at 150-51. The

excerpt states that Reverend Kim was transported to a political prison camp and "[h]e appears to have been beaten and starved to death after refusing to renounce his religion." Id. at 152. Kirkpatrick also states that "according to [Reverend Kim's] family, his remains are believed to be in People's Army Camp 91, a garrison on the outskirts of Pyongyang." Id. (footnote omitted). Kirkpatrick reports as the source for these details the plaintiffs' amended complaint and the filings docketed in this case. See Melanie Kirkpatrick, Escape from North Korea 329 n.20 (2012). In any event, the Kirkpatrick excerpt does not detail the nature or severity of the torture, or the frequency or duration of the acts of torture or the parts of the body at which they were aimed or any weapons used to carry them out.

IV. JURISDICTION IN THIS CASE

Section 1605A(a)(2)(A)(i)(I) provides in relevant part that a court shall hear a claim under § 1605A against a foreign state if that state "was designated as a state sponsor of terrorism at the time the [torture or extrajudicial killing] occurred, . . . and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section[.]" North Korea was designated as a state sponsor of terrorism in 1988. See Notice, Determination Pursuant to Section 6(j) of the Export

Administration Act of 1979; North Korea, 53 Fed. Reg. 3477-01 (Feb. 5, 1988). North Korea's designation was rescinded on October 11, 2008. See Notice, Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63540-01 (Oct. 24, 2008). Thus, North Korea remained designated as a state sponsor of terrorism within the 6-month period before this action was filed on April 8, 2009.

Section 1605A(a)(2)(A)(ii)(I) further requires that "the claimant or the victim was, at the time the act . . . occurred . . . a national of the United States." An individual deemed to owe a permanent allegiance to the United States and who actively pursues U.S. citizenship can be held to be a "national of the United States" in satisfaction of § 1605A(a)(2)(A)(ii)(I). See, e.g., Saludes v. Republica de Cuba, 577 F. Supp. 2d 1243, 1252 (S.D. Fla. 2008). At the time of Reverend Kim's abduction, plaintiff Yong Kim was a U.S. citizen and plaintiff Han Kim can be deemed to have been a U.S. national. He had lived in the U.S. since 1992 and became a Permanent Resident owing a permanent allegiance to the U.S. In 1999, before his father's abduction, he began the application process to become a naturalized American citizen with the intention of remaining in this country. Supplemental Declaration of Han Kim at 1-2.

For any "production of pain" to constitute torture under the TVPA definition, the act must be "purposive, and not merely haphazard . . . [or] the unforeseen or unavoidable incident of some legitimate end." Price, 294 F.3d at 93. Plaintiffs' proffered evidence includes expert opinions, a type of evidence that courts have credited in FSIA default actions. See Kilburn, 699 F. Supp. 2d at 143, 152. Hawk asserts that DPRK's policy is to imprison "political prisoners and others deemed to be opponents of the DPRK regime" to "deter dissent in the larger population[.]" Hawk Decl. ¶ 10. Hawk and Downs state that Reverend Kim was targeted by DPRK because of his "humanitarian activities" and because he was a Christian missionary who assisted North Korean defectors. Hawk Decl. ¶ 21; Downs Supp. Decl. ¶¶ 6(a)-(d), 7. In particular, Downs states that he is "virtually certain that Reverend Kim's killing was motivated by political considerations." Downs Supp. Decl. ¶ 7. Hawk adds that in DPRK's penal camps, "prisoners are not formally arrested, charged (or even told of their offense), or tried in any sort of judicial procedure." Hawk Decl. ¶ 11. The South Korean court decision and the expert evidence reflect that Reverend Kim was abducted at the behest of DPRK security forces, not in accordance with any legitimate judicial or other process, due to Kim's religious work and assistance to North Korean refugees.

Therefore, the plaintiffs have sufficiently shown that any mistreatment of Reverend Kim was done purposefully.

However, the plaintiffs' submissions do not establish the severity of the treatment of Reverend Kim in particular, or that his treatment amounts to torture under the rigorous definition of that term adopted in the FSIA.  DPRK's failure to respond to the complaint or to respond to any of the congressional inquiries regarding Reverend Kim's fate, in part, obscures the precise details of Reverend Kim's treatment following his abduction by DPRK agents.  Moreover, the widely feared nature of DPRK repression appears to force those individuals who may know details about Reverend Kim's whereabouts and treatment to convey such information sparingly and anonymously.  See, e.g., Do Hee-Youn Decl. ¶ 2 (describing "network of individuals that have supplied . . . information concerning North Korean matters" and explaining "many of these individuals are kept confidential to ensure their safety from potential retribution against them by the North Korean government").  Unfortunately for plaintiffs, no D.C. Circuit opinion appears to allow such circumstances to lessen the plaintiffs' exacting burden of proof.

Here, the declarations of the plaintiffs and Butler reflect no actual knowledge of how Reverend Kim was treated in the DPRK. The South Korean court decision convicted a DPRK agent of

abducting Reverend Kim, but does not refer to Reverend Kim being tortured. The congressional resolutions and correspondence sought, but did not provide, details about Reverend Kim's treatment. The State Department reports discussing abuse in DPRK prisons and media speculation that Revered Kim died provide no first-hand accounts detailing his treatment. The reports from Human Rights Watch and the United Nations provide no first-hand accounts of Reverend Kim's mistreatment and do not detail the frequency or duration of the acts of torture at the prison camps. The Kirkpatrick book excerpt recounts information docketed in this case but adds no first-hand information about Reverend Kim's treatment, or any details about the nature or severity of his torture, or the frequency or duration of any acts of torture or the parts of his body at which they were aimed or any weapons used to carry them out. Two of plaintiffs' declarants, Do Hee-Youn and Yoshikuni Yamamoto, recounted hearsay reports that Reverend Kim was tortured and died. The declarants did not, though, reveal the sources of the reports, specify their bases of knowledge, or provide useful details about the nature and severity of any torture.

The experts in this case describe conditions at an established and extensive system of penal colonies where the DPRK regularly holds abductees and political prisoners, and opine that

reports from defectors stating that Reverend Kim was tortured and is either still in custody or has died as a result of his treatment are credible.  However, Hawk does not report that the prisoners he spoke with had personal knowledge of Reverend Kim's treatment.  Hawk also does not describe the nature or severity of the torture Revered Kim suffered, or the frequency or duration of acts of torture upon him or the parts of the body at which they were aimed or any weapons used to carry them out.  Likewise, Downs does not identify the sources he deems credible upon whom he based his opinion that Reverend Kim probably died as a result of deliberate torture and malnutrition.  He does not reveal their bases of knowledge about Reverend Kim or say whether he has spoken with them.  Nor does Downs provide details regarding the severity of Reverend Kim's beatings.  Price constrains us from employing discussion about the abuses generally in these camps to show that mistreatment of Reverend Kim occurred that rose to the level of torture under the TVPA.  As the plaintiffs have not satisfied the requirements of the FSIA, subject matter jurisdiction is lacking.

Although the plaintiffs have not provided sufficient evidence to support jurisdiction under the FSIA, a district court ruling on whether facts in a complaint adequately allege a basis for invoking the torture exception under the FSIA should be

immediately appealable.  See Price, 294 F.2d at 92 (allowing

Libya to immediately appeal a district court decision rejecting

Libya's argument that the facts alleged in the complaint do not

bring the case within an FSIA immunity exception).  Moreover,

this case qualifies for an interlocutory appeal under 28 U.S.C.

§ 1292(b).  That statute provides that an interlocutory appeal

may be certified to the court of appeals when

> a district judge . . . shall be of the opinion that
> such order involves a controlling question of law as to
> which there is substantial ground for difference of
> opinion and that an immediate appeal from the order may
> materially advance the ultimate termination of the
> litigation.

28 U.S.C. § 1292(b).  "Under § 1292(b), a controlling question of

law is one that would require reversal if decided incorrectly or

that could materially affect the course of litigation with

resulting savings of the court's or the parties' resources[]" and

"include[s] issues that would terminate an action if the district

court's order were reversed."  APCC Servs., Inc. v. Sprint

Communic'ns Co., L.P., 297 F. Supp. 2d 90, 95-96 (D.D.C. 2003)

(internal citations and quotation marks omitted).  Here, the

determination of subject matter jurisdiction qualifies as a

controlling question of law.  See id.  Also, there is "a

substantial ground for difference of opinion" about whether

plaintiffs have presented the requisite quantum of evidence to

show that Reverend Kim was tortured under the FSIA.  Cf. Doe v.

Qi, 349 F. Supp. 2d 1258, 1312-17 (N.D. Cal 2004) (discussing Price and collecting cases applying the standard for sufficient factual allegations to allege torture under the FSIA). Finally, "[w]hen there are substantial grounds for difference of opinion as to a court's subject matter jurisdiction, courts regularly hold that immediate appeal may 'materially advance the ultimate termination of the litigation.'" Al Maqaleh v. Gates, 620 F. Supp. 2d 51, 55 (D.D.C. 2009). Certification for an interlocutory appeal in this case, then, is warranted.

### CONCLUSION AND ORDER

Subject matter jurisdiction over this action depends in part upon an adequate demonstration that Reverend Kim was tortured following his abduction. Plaintiffs have not met to the court's satisfaction the high standard recognized by this circuit under the FSIA for showing that Reverend Kim was tortured. Thus, the court lacks subject matter jurisdiction over this action. The motion for default judgment will be denied, and the case will be certified for interlocutory appeal on the issue of the requisite quantum of evidence for sufficiently alleging torture under the FSIA. Accordingly, it is hereby

ORDERED that plaintiffs' motion [14] for default judgment be, and hereby is, DENIED. It is further

ORDERED that this case be, and hereby is, certified for immediate appeal under 28 U.S.C. § 1292(b) because it involves a controlling question of law as to which there is a substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of this litigation. It is further

ORDERED that all proceedings in this case be stayed upon the application of the plaintiffs for an interlocutory appeal under 28 U.S.C. § 1292(b) of the finding that the court lacks subject matter jurisdiction under the FSIA.

SIGNED this 14th day of June, 2013.

_____/s/_____

RICHARD W. ROBERTS
United States District Judge
