# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 20, 2014      Decided December 23, 2014

No. 13-7147

HAN KIM AND YONG SEOK KIM,
APPELLANTS

v.

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, ALSO KNOWN AS
NORTH KOREA AND JOHN DOES 1-10,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00648)

———

*Asher Perlin* argued the cause for appellants. With him on the brief was *Robert J. Tolchin. Meir Katz* entered an appearance.

*Robert P. LoBue* argued the cause for *amicus curiae* Human Rights First. With him on the brief was *Gabor Rona*.

Before: TATEL and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Relying on the "terrorism exception" to the Foreign Sovereign Immunities Act, the family of Reverend Dong Shik Kim sued the North Korean government alleging that it abducted him, confined him to a *kwan-li-so*—a political penal-labor colony—tortured him, and, ultimately, killed him. When North Korea failed to appear, the Kims asked the district court for a default judgment pursuant to the provision of the Act that authorizes a court to enter judgment if the plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." The district court denied that motion because the Kims had failed to produce "first-hand evidence" of what happened to the Reverend. We reverse. Admissible record evidence demonstrates that North Korea abducted Reverend Kim, that it invariably tortures and kills political prisoners, and that through terror and intimidation it prevents any information about those crimes from escaping to the outside world. Requiring a plaintiff to produce direct, first-hand evidence of the victim's torture and murder would thus thwart the purpose of the terrorism exception: holding state sponsors of terrorism accountable for torture and extrajudicial killing. In these circumstances, we find the Kims' evidence sufficiently "satisfactory" to require a default judgment.

## I.

The Foreign Sovereign Immunities Act (FSIA) generally immunizes foreign governments from suit in the United States. *See* 28 U.S.C. § 1604. Truly heinous acts, however, can negate that immunity. Under the statute's "terrorism exception," state sponsors of terrorism may be liable in federal court for torture and extrajudicial killing. *See id.* § 1605A(a). The FSIA defines those substantive offenses by reference to the Torture Victims Protection Act (TVPA). *See id.* § 1605A(h)(7) (citing *id.* § 1350 note). That Act defines torture as "any act, directed against an individual in the offender's custody or physical control, by

which severe pain or suffering . . . is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual . . . intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." TVPA, Pub. L. No. 102-256, 106 Stat. 73, 73 (1992). An extrajudicial killing is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id.*

The Democratic People's Republic of Korea (DPRK or "North Korea"), long a mainstay on the State Department's list of terror sponsors—in fact, one of a small handful of bad actors that spurred Congress to adopt the terrorism exception in the first place, *see* H.R. Rep. No. 104-383, at 62 (1995)—has never shied away from torturing and killing its political enemies. *See generally* U.N. Human Rights Council, *Report of the Detailed Findings of the Commission of Inquiry on Human Rights in the Democratic People's Republic of Korea*, U.N. Doc. A/HRC/25/CRP.1 (Feb. 7, 2014). That much is clear. Equally clear, the Reverend Dong Shik Kim, the alleged victim in this case, spent nearly a decade providing humanitarian and religious services to North Korean defectors and refugees who fled to China seeking asylum. And there is no question that North Korean operatives abducted Reverend Kim in 2000 after the government found out about his activities. In fact, a South Korean court convicted a DPRK agent for that very kidnapping. *See Han Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29, 35 (D.D.C. 2013) (citing Decl. of J.D. Kim).

Beyond that, though, we have no direct evidence of the Reverend's fate. After his family, invoking the terrorism exception, sued the North Korean government, they presented numerous witnesses, including several experts on the regime's

brutal tactics, who claim to have heard second- or third-hand that the Reverend died as a result of torture soon after he disappeared. But no one—not the Kims, not the witnesses who submitted declarations on their behalf, and not the district court—knows for certain what happened.

Still, when the DPRK failed to show up to answer the charges, the Kims asked the district court for a default judgment holding the regime liable for torturing and killing the Reverend. The FSIA provides that "[n]o judgment by default shall be entered . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Precisely what that standard entails—that is, how much and what kind of evidence the default provision requires—is unclear.

That question is especially vexing where, as here, the defendant State prevents any evidence from leaving its borders. Recognizing as much, the district court observed that since North Korea "has not participated in the proceedings," since "there has been no opportunity for discovery," and since the "widely feared . . . repression" in the country "obscures the precise details of Reverend Kim's treatment," the plaintiffs "cannot be expected to meet a typical standard for judgment as a matter of law." *Kim*, 950 F. Supp. at 35, 42. Nonetheless, the district court concluded that the "evidence must be rigorous enough to support the facts necessary for jurisdiction." *Id.* Relying on *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002), in which this Court rejected an FSIA plaintiff's allegations because he had not recounted the precise nature of his mistreatment, the district court determined that the Kims had failed to carry their evidentiary burden. Specifically, it observed that their witnesses could "not establish the severity of the treatment of Reverend Kim in particular, or that his treatment amounts to torture under the rigorous definition of that term adopted in the FSIA," and instead

engaged only in "discussion about the abuses generally in [North Korean forced-labor] camps to show that" the DPRK "probably" mistreated the Reverend. *Kim*, 950 F. Supp. 2d at 41–42.

The Kims appeal. We review the district court's application of the law—in this case, its articulation of the FSIA's evidentiary requirements—de novo. *See Brayton v. Office of the United States Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011).

## II.

The Torture Victims Protection Act—and, by reference to that Act, the FSIA—describes torture and extrajudicial killing in some detail. An act is torture only if the perpetrator intends to and actually does inflict severe pain in order to punish or to extract information. A killing runs afoul of the statute only if it occurs outside the normal legal process. The statute thus imposes tight constraints on courts required to decide whether an act satisfies the terrorism exception's substantive elements. But when the defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be "satisfactory to the court." 28 U.S.C. § 1608(e).

Our case law provides little help. Indeed, the single case on which the district court relied—*Price*—differs significantly from this one. In that case, we were considering Libya's motion to dismiss under a "standard . . . similar to that of Rule 12(b)(6)," and we granted that motion because the plaintiff's *allegations* were too general, observing that he "offer[ed] no useful details about the nature" or "purpose of the alleged torture." *Price*, 294 F.3d at 93–94. Absent more specific allegations, we explained, we were unable to distinguish between "actual torture" and "mere police brutality." *Id.* at 93. Here, by contrast, the issue is

whether the Kims are entitled to a default judgment—a question that turns on whether the *evidence* is "satisfactory to the court." Of course, the Kims alleged plenty in their complaint, asserting, for example, that "[w]hen Reverend Kim refused to adopt the [official political] ideology [of North Korea,] he was punished by being deprived of all food" and that he "died as the result of [that] starvation and [] torture." Compl., ¶¶ 24–25. If proven *with admissible evidence*, that treatment would clearly constitute torture within the TVPA's meaning. But while accepting the Kims' *allegations* as true, the district court concluded that their *evidence* was too weak to support their claims. Specifically, it emphasized repeatedly that the plaintiffs had failed to "provide any *first-hand accounts* of Reverend Kim's treatment" that "address[ed] the nature or severity of any torture Reverend Kim suffered, or specif[ied] the frequency or duration of the acts of torture or the parts of the body at which they were aimed or any weapons used to carry them out." *Kim*, 950 F. Supp. 2d at 37 (emphasis added). Properly understood, then, the question before us is not whether the Kims' allegations were specific enough to implicate the terrorism exception and withstand a motion to dismiss, but rather whether the amount and types of evidence they proffered were "satisfactory." On that question, *Price* has nothing to say.

Another important distinction separates this case from *Price*. Having escaped their captors, the *Price* plaintiffs were alive, present, and capable of describing their treatment in more detail. In those circumstances, we could realistically expect more from them. By contrast, Reverend Kim is missing and presumed dead, so his family will almost certainly be unable to offer the court any more than they already have.

This second observation is key to the Kims' case. Congress enacted the terrorism exception expressly to bring state sponsors of terrorism—including, at the time, the DPRK—to account for

their repressive practices. *See* H.R. Rep. No. 104-383, at 62. Concerned with victims' inability to obtain redress in terrorism cases, Congress later amended the statute to make it easier to attach a foreign State's property during litigation and to seize those assets to satisfy a judgment. *See* 28 U.S.C. §§ 1605A(g), 1610. And the statute has always authorized the courts to enter default judgments against defendants who refuse to appear. *Id.* § 1608(e). With these provisions, Congress aimed to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.

Here, North Korea seeks to do exactly that. The regime has made Reverend Kim unavailable to testify on his own behalf, refused to appear in court and subject itself to discovery, and is known to intimidate defectors and potential witnesses. Indeed, the district court concluded, the regime is so feared that "those individuals who may know details about Reverend Kim's whereabouts and treatment . . . convey such information sparingly and anonymously," if at all. *Kim*, 950 F. Supp. 2d at 42; *see also* Decl. of Do Hee-Youn ¶ 2 (explaining that the identities of "individuals that have supplied . . . information concerning North Korean matters . . . are kept confidential to ensure their safety from potential retribution against them by the North Korean government").

In these circumstances, requiring that the Kims prove exactly what happened to the Reverend and when would defeat the Act's very purpose: to "give American citizens an important economic and financial weapon," H.R. Rep. No. 104-383, at 62, to "compensat[e] the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Price*, 294 F.3d at 88–89. This is especially true in cases of forced disappearance, like this one, where direct evidence of subsequent torture and execution will, by definition, almost

always be unavailable, even though indirect evidence may be overwhelming. Were we to demand more of plaintiffs like the Kims, few suits like this could ever proceed, and state sponsors of terrorism could effectively immunize themselves by killing their victims, intimidating witnesses, and refusing to appear in court.

Fortunately for the Kims and for Congress's objective, the Supreme Court has "recognize[d] very realistically" that courts have the authority—indeed, we think, the obligation—to "adjust [evidentiary requirements] to . . . differing situations." *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981) (citing *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973)). Consider, for instance, the long-established, common-law rule of *res ipsa loquitur*, or, literally, "the thing speaks for itself." Under that doctrine, the courts have, without direct proof, inferred negligence from the very nature of events—say, from the fact that a surgery patient awoke from anesthesia to discover that a sponge had been left in her gut. That sort of inference is justified in part on the ground that "the court does not know, and cannot find out, what actually happened in the individual case," often because the facts are known only to the defendant. RESTATEMENT (THIRD) TORTS: PHYSICAL AND EMOTIONAL HARM § 17 cmt. A, at 184 (2005). This approach allows the court to "encourag[e] the defendant to disclose relevant evidence," *id.* at 193, and, if the defendant is unable to do so, to reach the common-sense conclusion "that it was probably the defendant's negligence which caused the accident." 2A STUART M. SPEISER, CHARLES F. KRAUSE, & ALFRED W. GANS, THE AMERICAN LAW OF TORTS 508 n.30 (2009).

Or take the well-known *McDonnell Douglas* formula for making out a Title VII claim. Because a plaintiff faces "difficulty . . . in proving the motives behind an employer's actions" in a race-discrimination case, the Supreme Court has

held that, in order to make out a prima facie case, he need only show that he is a member of a protected class and that he was denied an open position for which he was qualified and that remains open. *Bundy*, 641 F.2d at 950 (citing *McDonnell Douglas*, 411 U.S. at 802). This inference makes sense, as "common experience tells us" that such facts are normally evidence of a "discriminatory motive." *Id.* at 951.

Similarly, plaintiffs like the Kims will find it difficult to prove what happened behind the walls of a North Korean labor camp because the government has made all but certain that that evidence does not exist. But "common experience tells us" that where a plaintiff has produced compelling, admissible evidence that the regime abducted the victim and that it routinely tortures and kills the people it abducts, the courts can assume that the defendant probably tortured and killed the victim. Given Congress's purpose—holding state sponsors of terrorism responsible for their crimes—such evidence is sufficient to "satisf[y] the court."

International tribunals with experience in these kinds of cases have taken the same approach. For instance, the Inter-American Court of Human Rights—the United States is a signatory to the Court's underlying treaty, though not a state party—has recognized that circumstantial evidence is "especially important" in cases of forced disappearance, Radilla-Pacheco v. Mexico, Preliminary Objections, Merits, Reparations, and Costs, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 209, ¶ 222 (Nov. 23, 2009), because "this type of repression is characterized by an attempt to suppress all information about the kidnapping or the whereabouts and fate of the victim." Velásquez-Rodriguez v. Honduras, Merits, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 4, ¶ 131 (July 29, 1988). So where "it has not been directly shown that [the victim] was physically tortured, his kidnapping and imprisonment by governmental

authorities, who have been shown to subject detainees to indignities, cruelty and torture, [may] constitute" proof of that treatment. *Id.* ¶ 187.

## III.

We thus turn to the question of whether the Kims have met their burden of producing evidence "satisfactory to the court." Mindful that we must draw our "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence," *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001), we begin with what we know for sure: that North Korean agents abducted Reverend Kim. A South Korean court convicted a DPRK intelligence agent for planning and executing that kidnapping, *see supra* p. 3, and the district court took judicial notice of that decision under Rule 201. *See Kim*, 950 F. Supp. 2d at 35. Two experts, moreover—just the kind of experts whose testimony we have credited in FSIA default actions, *see Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131–32 (D.C. Cir. 2004), and whose testimony is doubtless admissible, *see* Fed. R. Evid. 702—reported that victims of forced disappearance in North Korea usually suffer torture and that Reverend Kim's political and religious activities made him an especially likely target.

Recall that maltreatment is actionable under the FSIA only if purposeful and particularly harsh and that killings are prohibited only if they occur outside the limits of the normal legal process. The Kims' experts make a compelling case that North Korea violated both provisions.

Professor David Hawk, an expert on human rights in North Korea who has interviewed dozens of former *kwan-li-so* prisoners, reports that such prisoners regularly endure harsh treatment, including starvation, brutal beatings, rape, and forced abortion. Decl. of Professor David Hawk ¶¶ 14–19. Although

acknowledging that he lacks "firsthand knowledge about Reverend Kim's case specifically," Professor Hawk believes it "likely that [Reverend Kim] would have been . . . transferred to a *kwan-li-so*" and that, once there, the Reverend—a "valuable target of the DPRK"—would have suffered "additional brutality" even beyond that typical of Korean labor camps. *Id.* ¶ 20. That treatment, he reports, would probably mean twelve hours of physical labor per day, seven days a week, and "long-term solitary confinement in punishment cells which do not have enough space for a person to completely lie down or stand up, causing inmates to experience a loss of circulation and atrophy of legs, and often leading to death within several weeks." *Id.*¶ 15.

Ernest Downs, a former senior Defense Department official and member of the board of the U.S. Committee for Human Rights in North Korea, testifies with even more certainty: of the one thousand former prisoners with whose testimony he is familiar, he "do[es] not know of any case in which the former prisoner was *not* subjected to torture while in the prison camp." Supplemental Decl. of Ernest C. Downs ¶ 10. That treatment includes "kneeling motionless" for hours on end, "water torture," "'pigeon torture' with . . . arms pinned behind [the] back and attached to cell bars in ways that made it impossible either to stand up or sit down," and other typical torture that is, regrettably, too commonplace to require detailed description here. *Id.*, Ex. 1, at 149.

Of course, suffering alone is insufficient to establish a claim under the FSIA's terrorism exception. To qualify as torture, the mistreatment must be purposeful—that is, the defendant must have targeted the victim, for instance, to punish him for his religious or political beliefs. Along these lines, Professor Hawk testifies that North Korea's policy is to imprison "political prisoners and others deemed to be opponents of the DPRK

regime" to "deter dissent in the larger population." Hawk Decl. ¶¶ 9–10. According to Professor Hawk, moreover, North Korea targeted Reverend Kim not only because of his "humanitarian activities," but also because he was a Christian missionary who proselytized to defectors. *Id.* ¶ 21. For his part, Downs is "virtually certain" that Reverend Kim, "a foreigner abducted by the DPRK for political purposes," would have been singled out for "exceptionally painful, brutal, and outrageous treatment" and is probably dead "as a result of his torture and malnutrition." Decl. of Ernest C. Downs ¶ 34; Downs Suppl. Decl. ¶¶ 6(i), 7, 8. This expert testimony is more than sufficient to "satisf[y]" us that North Korea purposefully tortured Reverend Kim.

With respect to extrajudicial killing, the Kims need demonstrate only that the DPRK killed the Reverend without due process. Professor Hawk "believe[s] that" the Reverend suffered an "untimely death" due to starvation. Hawk Decl. ¶ 20. Going even further, Downs believes that the Reverend's "death resulted from torture and malnutrition" and was "deliberately caused by his North Korean captors." Downs Suppl. Decl. ¶ 13. Given these uncontroverted expert statements, we have no trouble concluding that the Kims presented sufficient evidence to "satisf[y] the court" that the North Korean government killed Reverend Kim outside the formal legal process.

Finally, an observation about our decision's reach. Our conclusion would no doubt differ if we lacked confirmed evidence that the DPRK was involved in Reverend Kim's disappearance. In that case, finding that the regime tortured and killed him would arguably require too many logical leaps. But that is not this case. Here, the Kims' evidence that the regime abducted the Reverend, that it invariably tortures and kills prisoners like him, and that it uses terror and intimidation to prevent witnesses from testifying allows us to reach the logical

conclusion that the regime tortured and killed the Reverend. In other words, the Kims' evidence is "satisfactory to the court."

For all of these reasons, we reverse and remand with instructions to the district court to enter a default judgment on the Kims' behalf. If the DPRK is unhappy with that outcome and has evidence that it has not tortured and killed Reverend Kim, it, like any defendant in default, may ask the district court to vacate that judgment under Federal Rule of Civil Procedure 60(b).

*So ordered.*